# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 26, 2011

No. 10-60749

Lyle W. Cayce
Clerk

OAKTREE CAPITAL MANAGEMENT, L.P.; TBR PROPERTY, L.L.C., doing business as Turtle Bay Resorts; BENCHMARK HOSPITALITY, INC.,

Petitioners - Cross-Respondents

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent - Cross-Petitioner

---

Petition for Review and Cross Petition for Enforcement
of an Order of the National Labor Relations Board

---

Before JONES, Chief Judge, and BARKSDALE and GRAVES, Circuit Judges.

PER CURIAM:[*]

Oaktree Capital Management, L.P. (formerly L.L.C.), TBR Property, L.L.C., doing business as Turtle Bay Resorts, and Benchmark Hospitality, Inc., challenge the National Labor Relations Board's (NLRB or the Board) affirming an administrative law judge's (ALJ) decision in favor of the NLRB. NLRB seeks order enforcement.

At issue are the Board's findings that: Oaktree and TBR constitute a single employer for purposes of the National Labor Relations Act (NLRA), 29

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60749

U.S.C. §§ 151-69; and petitioners engaged in unfair labor practices regarding Union representatives' access to, and collection of dues at, the Turtle Bay Hotel and Resort (the Resort), in violation of NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1) (unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights [to engage in or refrain from self-organization, to form, join, or assist labor organizations, and to bargain collectively]"), and § 8(a)(5), 29 U.S.C. § 158(a)(5) (unfair labor practice "to refuse to bargain collectively with the representatives of employees"). PETITION FOR REVIEW DENIED; BOARD'S ORDER ENFORCED.

## I.

The Resort is located in Kahuku, Hawaii, on the island of Oahu. UNITE HERE! Local 5 (the Union), representing approximately 360 employees at the Resort, claimed petitioners engaged in unfair labor practices arising from the Union's campaign, during February 2004 through September 2005, to obtain a new collective bargaining agreement (CBA). The prior CBA had either expired or been terminated (ended) on 25 November 2003. The parties agree that the CBA's access provision survived and was in effect while a new CBA was being negotiated.

The NLRB charged: Oaktree and TBR constituted a single employer for purposes of the NLRA; and petitioners violated NLRA § 8(a)(1) and (5) by, *inter alia*, restricting Union representatives' access to the Resort on 14 and 18 February 2004, and prohibiting them from collecting dues at the Resort. Only these three claims are at issue.

During all times relevant to this proceeding, Oaktree was a California limited liability company (L.L.C.). It became a limited partnership (L.P.) in 2007. Oaktree was either the general partner or investment manager for several investment funds, three being: Oaktree Capital Management Real Estate Opportunities Fund A, L.P.; Oaktree Capital Management Real Estate Opportunities Fund B, L.P.; and Gryphon Domestic VII, L.L.C. (collectively, the

2

Funds). In 2000, Oaktree, on behalf of the Funds, purchased entities that owned Kuilima Resort Company (Kuilima), which had, with its predecessor in interest, Kuilima Development Company, owned the Resort. Oaktree retained Kuilima as part of the Resort's ownership structure.

In August 2001, TBR, a newly created Kuilima subsidiary, leased the Resort from Kuilima. That September, TBR contracted with Benchmark to manage the Resort.

Those working at the Resort, however, are not solely Benchmark employees—Benchmark employees manage other employees at the Resort. In that regard, unchallenged here is the Board's finding that TBR and Benchmark are joint employers. On the other hand, at issue is whether, for purposes of the NLRA, Resort employees are employed by Oaktree and TBR, as a single employer, or only by TBR.

As noted, the CBA ended on 25 November 2003. Negotiations for a new CBA were ongoing in 2004 when the charged unfair labor practices occurred.

On 12 February 2004, while a wedding was taking place at the Resort, Union representatives and Resort employees held a rally on a public beach adjacent to the Resort. The rally was held to demonstrate support for the CBA negotiations. Wedding guests confronted the group and asked it to disperse because the wedding was being disrupted. After the group declined, Resort security evicted its members and called the police.

Shortly thereafter, on 14 and 18 February, Union representatives were at the Resort to conduct normal Union business. They were issued trespass notices and directed to leave the premises.

That April, the practice of deducting Union dues from employees' paychecks was ended. That May, Union representatives were informed that they were prohibited from collecting Union dues at the Resort from employees.

In 2006, after extensive hearings in 2005, the ALJ ruled, *inter alia*: Oaktree and TBR constituted a single employer, based on finding, *inter alia*, that

Oaktree "acquired ownership and control of Turtle Bay Resort in 2000"; and petitioners violated NLRA § 8(a)(1) and (5), by restricting Union representatives' access to the Resort on 12 and 14 February 2004 and by prohibiting them from collecting Union dues at the Resort. *Oaktree Capital Mgmt., L.L.C.*, 353 N.L.R.B. No. 127, at *9, *17-21, *27-29, *31, *60-67, *86-87 (2009). In 2009, a Board two-member panel affirmed the ALJ's decision, and the petition and cross-petition were filed here. Our court remanded in the light of *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2644-45 (2010) (holding Board panels must consist of three or more members). *Oaktree Capital Mgmt., L.P. v. NLRB*, No. 09-60327 (5th Cir. 7 July 2010) (order granting NLRB's unopposed motion to remand). In 2010, a Board three-member panel affirmed the ALJ's decision and incorporated the Board's 2009 decision. *See Oaktree Capital Mgmt., L.L.C.*, 355 N.L.R.B. No. 147, at *1 (2010).

Through a brief decision and order, that 2009 decision affirmed the ALJ's 78-page rulings, findings, and conclusions, adopted a modified version of the ALJ's recommended order, attached the ALJ's decision, and, for the reasons stated by the ALJ, ruled, *inter alia*: Oaktree and TBR constituted a single employer; petitioners violated NLRA § 8(a)(1) on 12 and 14 February 2004, by informing Union representatives that they were trespassing, contrary to their contractually-established right of access, issuing trespass notices to them, evicting them from the Resort, and summoning law enforcement to remove them; and petitioners violated NLRA § 8(a)(5) by unilaterally changing CBA access provisions. *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *1-5 & nn.5-6.

## II.

At issue are: the single-employer finding (Oaktree and TBR jointly and severally liable for remedying unfair labor practices at the Resort), contested only by Oaktree; and some of the findings on claimed NLRA § 8(a)(1) and (5) violations, regarding Union representatives' access to, and dues collection at, the Resort, contested by all petitioners. NLRB cross petitions for enforcement of the

Board's order. *See Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 509 (5th Cir. 2002) (NLRB order must be enforced by federal court to carry effect of law).

Our review is of the Board's decision, which, *inter alia*, affirmed the ALJ's rulings, findings, and conclusions. *See, e.g.*, *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 449-50 (5th Cir. 2003). The Board's findings of fact, and its applications of law to those facts, are reviewed for substantial evidence; its legal conclusions, *de novo*, and accorded deference if they are reasonably based in the law and not inconsistent with the NLRA. *E.g.*, *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008); *Tellepsen Pipeline Servs. v. NLRB*, 320 F.3d 554, 559 (5th Cir. 2003); *see also* 29 U.S.C. § 160(f) ("the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive"). "Substantial evidence" is "such relevant evidence as a reasonable mind would accept to support a conclusion". *Sara Lee Bakery*, 514 F.3d at 428 (citation and internal quotation marks omitted).

In other words, under the substantial-evidence standard, the record is reviewed as a whole, and the Board's findings of fact, along with its application of law to those facts, "must be upheld if a reasonable person could have found what [it] found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance". *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (citation and internal quotation marks omitted); *e.g.*, *Tellepsen Pipeline*, 320 F.3d at 559. "In determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence." *NLRB v. Allied Aviation Fueling of Dallas, L.P.*, 490 F.3d 374, 378 (5th Cir. 2007) (citation omitted). Therefore, under this standard of review, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence". *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

No. 10-60749

**A.**

Before reaching the three issues raised in the petition, we address NLRB's contention that it is entitled to summary enforcement of the Board's uncontested findings. "Case law has established that when an employer does not challenge a finding of the Board, the unchallenged issue is waived [in our court], entitling [NLRB] to summary enforcement." *Sara Lee Bakery*, 514 F.3d at 429 (citing *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 363 n.2 (5th Cir. 1990)).

As noted, challenged are only the Board's findings regarding: the single-employer determination; and claimed NLRA § 8(a)(1) and (5) violations involving Union access to, and dues collection at, the Resort. Because petitioners do not contest findings regarding the numerous other unfair labor practices addressed in the Board's order, NLRB is entitled to summary enforcement of those findings. *See Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at \*2-5 (*e.g.*, maintaining overly broad rules that prohibit employees from soliciting or distributing literature in nonwork areas and during nonwork time; following Union representatives, eavesdropping on their conversations with employees, and videotaping or photographing them engaged in peaceful demonstrations; preventing them and employees from accessing public beaches adjacent to the Resort; threatening to close the Resort in retaliation for protected activity, such as demonstrations and boycotts; and failing or refusing to bargain in good faith with the Union, by failing to provide requested information).

**B.**

Regarding the Board's finding that Oaktree and TBR constituted a single employer, at issue is whether Oaktree is sufficiently connected to TBR so that Oaktree is jointly and severally liable with TBR, as a single employer, for remedying unfair labor practices. *See, e.g.*, *Vance v. NLRB*, 71 F.3d 486, 488-89, 494-95 (4th Cir. 1995) (companies found to be single employer held jointly and severally liable for remedying claimed unfair labor practices); *Apex Elec. Servs., Inc.*, 356 N.L.R.B. No. 172, at \*2 (2011) (same); *Summit Express, Inc.*, 350

6

N.L.R.B. 592, 596-97 (2007) (same). The objective is to ensure that the Board's decision and order are binding on the entity or entities responsible for controlling labor relations at the Resort.

As noted *supra*, petitioners do not contest the finding that Benchmark and TBR constitute a joint employer. At issue is whether Oaktree is part of that joint employment. The ALJ found that TBR was "a shell corporation with no purpose other than to provide insulation to Kuilima and Oaktree from TBR['s] . . . selection of Benchmark as the operator and manager of the resort". *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *11. For the reasons discussed below, substantial evidence supports the single-employer finding. *See, e.g.*, *NLRB v. DMR Corp.*, 699 F.2d 788, 791 (5th Cir. 1983) (single-employer determination is primarily factual and reviewed under substantial-evidence standard).

"Single employer status ultimately depends on 'all the circumstances of the case' and is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'" *Id.* at 791 (quoting *Local 627, Int'l Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040, 1045-46 (D.C. Cir. 1975)); *see, e.g.*, *Covanta Energy Corp.*, 356 N.L.R.B. No. 98, at *35 (2011) (absence of arm's length relationship is *hallmark* of single employer). Whether two or more entities are sufficiently integrated to be deemed a single employer is determined by analyzing the following factors: (1) common ownership or financial control; (2) common management; (3) centralized control of labor relations; and (4) interrelation of operations. *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); *DMR Corp.*, 699 F.2d at 790-91; *Carnival Carting, Inc.*, 355 N.L.R.B. No. 51, at *6-8 (2010). "[N]o one of these factors is controlling, nor need all criteria be present". *DMR Corp.*, 699 F.2d at 791. "A single-employer analysis is appropriate where two ongoing businesses are coordinated by a common master." *Covanta Energy Corp.*, 356 N.L.R.B. No. 98 at *34 (citations omitted). For this analysis, "the fundamental

inquiry is whether there exists overall control of critical matters at the policy level". *Id.* (citation and internal quotation marks omitted).

"The Board has held that the factors of common control over labor relations, common management, and interrelation of operations are more critical than the factor of common ownership or financial control, and that centralized control of labor relations is of particular importance because it tends to demonstrate operational integration." *Id.* at *35 (citation and internal quotation marks omitted). In any event, substantial evidence supports all four single-employer criteria being present.

The dissent takes issue with the NLRB, rather than this opinion, for, in the dissent's view, applying the single-employer theory to Oaktree "when no labor law policy is advanced". *Dissent* at 9. As demonstrated below, that is not the case. In any event, the dissent never attempts to come to grips with our above-discussed, controlling standard of review: whether substantial evidence supports the single-employer finding. As also demonstrated below, it does. In replying to this opinion's noting this fundamental failure by the dissent, it justifies, as a matter of law, not applying the substantial-evidence standard by maintaining: "as applied to this case, the single employer theory itself is unjustifiable". *Id.* at 1 n.1. This point of law, however, was not raised here by Oaktree; accordingly, we can not consider it. Alternatively, even if an extremely strained reading of Oaktree's opening brief so much as suggests that point of law, it was not adequately briefed by Oaktree and is, of course, waived. Finally, in the further alternative, even if that point of law can be considered, it fails for the reasons discussed below. Simply put, the extensive record reflects, *inter alia*, that Oaktree, an *asset manager* in addition to being an investment manager or financial adviser, was far more involved in management of the Resort, including labor relations, than the dissent recognizes.

**1.**

Regarding common ownership or financial control, Oaktree contends that, in 1998, the Funds purchased entities that collectively owned the Resort. On the other hand, the NLRB contends that Oaktree purchased the Resort in 2000 from a Japanese corporation. It is not clear whether Oaktree directly owned the Resort. Substantial evidence, however, supports the finding that Oaktree initially purchased the Resort on behalf of the Funds and participated significantly in its financial control, as discussed *infra*.

At the hearing before the ALJ, Oaktree's custodian of records and senior vice president, legal, Marc Porosoff, testified: the Resort is owned by Kuilima, a Hawaii general partnership; Kuilima has two general partners, one of which—Turtle Bay Holding, L.L.C.—is a "99 percent general partner", and the other—A.J. Plaza Hawaii Company, Limited—is wholly owned by Turtle Bay A.J. Plaza, L.L.C.; there are three members of Turtle Bay Holding, L.L.C., and Turtle Bay A.J. Plaza, L.L.C.; those three members are the Funds, with OCM Real Estate Opportunities Fund A, L.P., owning 28%, OCM Real Estate Opportunities Fund B, L.P., 68%, and Gryphon Domestic VII, L.L.C., 4%; Oaktree is the general partner for OCM Real Estate Opportunities Funds A and B and the investment manager for Gryphon Domestic VII; TBR, Kuilima's wholly-owned subsidiary, leases the Resort from Kuilima; and TBR entered into a management agreement with Benchmark to operate the Resort "on a day-to-day basis".

Oaktree's brief for the ALJ, filed here via motion granted by our court, however, reflects that Oaktree, directly or indirectly through the Funds, purchased the Resort from a Japanese corporation in 2000. That brief states: "[that Japanese corporation] was unable to invest in Turtle Bay's upkeep and, in 2000, sold the resort to Oaktree Capital Management, LLC, *an asset and investment manager*". (Emphasis added.) Further, Benchmark's staff handbook lists Oaktree as the Resort owner and notes that Oaktree purchased the Resort

in 2000.  The ALJ found:  "Oaktree owns the owner of Kuilima, which, in turn, owns TBR . . . ."  *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *12.

Accordingly, substantial evidence supports the finding that Oaktree purchased the Resort as an investment for the Funds.  Substantial evidence also shows that, since 2000, Oaktree has invested $50 million to renovate the Resort and has created or purchased various other entities and placed them in the ownership chain between itself and the Resort.  As noted, it is not clear whether Oaktree itself owned the Resort; however, ownership is relatively unimportant in the light of substantial record evidence, discussed below, that Oaktree maintained ultimate control over the Resort, including its labor relations.

**2.**

Regarding common management, substantial evidence supports the finding that it exists for Oaktree and TBR.  Russell Bernard, who did not testify, was a member and principal of Oaktree, as well as the portfolio manager for Oaktree's real-estate funds, including OCM Real Estate Opportunities Funds A and B.  Bernard was also the president of TBR.

In addition to being Oaktree's senior vice president, legal, Porosoff was TBR's vice president and treasurer.  Oaktree provided Porosoff, as its custodian of records, to testify on its behalf.  Notably, at the hearing before the ALJ, when asked his positions with TBR, Porosoff responded:  "I *believe* I'm a vice president of TBR . . . .  I *may also be* the treasurer of TBR . . . but I would have to see the operating agreement to be sure".  (Emphasis added.)   Porosoff stated he "believed" he had been an officer with TBR since it was formed, which he "believed" was in "2001, probably August or September . . . ."

When questioned about a chart his office had created, that was provided to the ALJ to assist in explaining the Resort's ownership structure, Porosoff testified: "We create organizational charts for different *assets that we manage*".  (Emphasis added.)  When asked who he meant by "we", he answered: "Oaktree.  Oaktree is an investment manager *and an asset manager*".  (Emphasis added.)

Additionally, Porosoff reiterated that Oaktree manages "assets". Substantial evidence shows that the Resort was an asset, and that Oaktree, as its manager, was the entity that had to be consulted before any significant decisions were made at the Resort, as discussed *infra.*

Stephanie Schulman served as Oaktree in-house counsel and TBR vice president and secretary. Along that line, there is no record evidence that TBR "ha[d] any officers, managers, or principals other than [those] of Oaktree". *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *12.

Further, although Hy Adelman did not testify, Nancy Ramos, Benchmark's director of human resources, testified that Adelman was "a representative of Oaktree" and had an office on the Resort's grounds. Abid Butt, Benchmark's vice president and general manager, testified: Adelman was an Oaktree employee; he had an office on the Resort's grounds; and Butt met with Adelman in Adelman's capacity as the "owner representative". When asked if that "owner representative" was Oaktree, Butt testified: "[Adelman is] the person responsible for the overall resort . . . ." On the other hand, Porosoff testified that he believed Adelman worked for Kuilima and was not an Oaktree employee. On at least one occasion, Adelman signed a housekeeping supply agreement as "general manager" on behalf of "owner/representative".

Oaktree does not dispute that it shared common managers with TBR. Instead, it relies on *Lusk v. FoxMeyer Health Corporation*, 129 F.3d 773, 779-80 (5th Cir. 1997), for the rule that individuals with roles in the parent and a subsidiary company may wear multiple hats, discharging responsibilities to more than one entity. *Lusk* ruled, however, under *de novo* review, that there was no single employer because appellants had failed to point to any evidence demonstrating that officers holding positions with both the parent and subsidiary were acting in their capacity as officers of the parent when they engaged in alleged discriminatory conduct. *Id.* at 776, 779-81 ("appellants point us to no evidence that these three [officers] ever sought approval from or even

11

consulted anyone else in the [parent] organization"). As demonstrated *infra*, substantial evidence supports the finding that Bernard was acting on Oaktree's behalf in controlling the Resort's labor relations.

### 3.

Regarding centralized control of labor relations, substantial evidence supports the finding that Oaktree, through Bernard, controlled those relations and negotiations between the Resort and the Union. As noted, the underlying incidents began in February 2004. Earlier, by a 24 April 2003 letter on Oaktree letterhead, addressed "Dear Partner" and signed Oaktree "principal", Bernard discussed, *inter alia*, labor negotiations with the Union:

> You may have recently received correspondence from Local 5, the union representing . . . employees at our Turtle Bay Resort. I am writing to give you some background. . . . The stated purpose of Local 5's letter is to express its concern regarding the pace of negotiations for a new contract with its members who work at the hotel. We would like to assure you that, contrary to the union's assertions, *we have been acting in good faith to reach a fair and equitable agreement with Local 5*. . . . Since our funds acquired 100% ownership and control of the Turtle Bay Resort in the fourth quarter of 2000, *we have worked diligently to turn around the property*, guided by the principle that if the hotel is successful, then the employees will be among the beneficiaries of that success. . . . [W]e have invested approximately $50 million over the last two years to renovate the [Resort] . . . . *[W]e have not cut the number of employees on the payroll* and we have actually increased the employment opportunities at the property. . . . While many of the other unions representing . . . employees support [a ballroom renovation], Local 5's management has lobbied against it . . . . We wish the hotel's performance *allowed us to offer Local 5 the generous contract it wants. . . . [W]e believe we have offered Local 5 a fair and equitable agreement . . . .* Once the hotel's performance improves . . . we will be happy to share the property's success with Local 5's members.

(Emphasis added.)  Oaktree contends "we" means TBR; NLRB, that it means Oaktree.

Later, on 8 November 2003, the Union's financial secretary-treasurer sent a letter to Bernard, in his capacity as Oaktree representative ("Russ Bernard[,] Oaktree Capital Management[,] Via email:  [to his Oaktree email address]"). The letter discussed, *inter alia*, "contract negotiations for the Turtle Bay Resort [employment] agreement", a "settlement offer", "the employer's wage offer", and an offer to "withdraw the outstanding NLRB charge . . . on condition that *you direct your* management staff and security chief to cease and desist their unwarranted interference with our legitimate right of access . . . ." (Emphasis added.)  That letter stated in pertinent part:

> Thank you for your telephone communication with me. We have discussed the situation in our contract negotiations for the Turtle Bay Resort agreement, and I agreed to clearly outline the open [collective bargaining] issues for you, and to offer what the Union believes is the basis for a settlement. . . .  [A]s I indicated in our phone conversation, we are willing to withdraw the outstanding NLRB charge, assuming there is a satisfactory settlement on the outstanding items listed above, and on condition that you direct your management staff and security chief to cease and desist their unwarranted interference with our legitimate right of access to the property and our membership.

Accordingly, substantial evidence supports the finding that Bernard was acting on Oaktree's behalf when he participated in labor negotiations with the Union—a failed activity which ultimately lead to the above-described public-beach rally on 12 February 2004 and the charged unfair labor practices regarding Union access and dues collection. *See, e.g.*, *Asher Candy, Inc. v. NLRB*, 258 F. App'x 334, at *1 (D.C. Cir. 2007) ("[C]entralized control of labor relations is evident from the [subsidiary's] inability to enter into a collective

bargaining agreement without the approval of [the parent company's] board of directors". (citation omitted)).

Oaktree contends that involvement in high-level decisions affecting labor relations was insufficient for the Board to "pierce the corporate veil" and find Oaktree to be a single employer with TBR. The Board did so by reaching through the subsidiary (TBR) to hold the parent (Oaktree) liable for unfair labor practices. *See Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980-81 (4th Cir. 1987) ("Courts will peer behind the corporate veil if the parent dominates the subsidiary 'to the extent that the [subsidiary] . . . functions solely to achieve the purposes of the [parent] corporation.'" (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973)).

Oaktree maintains a single employer must be involved in the day-to-day management of labor relations, citing *Lusk*, 129 F.3d at 777 n.3, which stated:

> [B]efore piercing the corporate veil *in the employment discrimination context*, we and other courts have focused on the core activities regulated by the anti-discrimination laws and, therefore, on whether the parent corporation was so involved in the daily employment decisions of the subsidiary as to justify treating the two corporations as a single employer.

(Emphasis added.) As Oaktree notes, *Lusk* held, in that context, that the "analysis ultimately focuses on . . . whether the parent corporation was a final decision-maker in connection with the employment matters underlying the litigation . . . ." *Id.* at 777 (citation omitted).

Although this is true for an employment-discrimination claim, which usually involves a single person or entity responsible for a definitive act of discrimination, it is not necessarily true for a dispute, as here, concerning labor practices and failed CBA negotiations. Notably, even in the employment-discrimination context, our court has held no single-employer status because appellant "fail[ed] to present any evidence that [the parent entity] actually made *any* of [the subsidiary's] labor decisions, *including* decisions regarding [the

underlying litigation]". *Johnson v. Crown Enters.*, 398 F.3d 339, 344 (5th Cir. 2005) (emphasis added).

**4.**

Regarding interrelation of operations, in its above-referenced brief for the ALJ, Oaktree acknowledged: "TBR . . . is nothing more than the legal lessor of the property upon which the . . . Resort is situated". *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at \*11 (internal quotation marks omitted). That admission is further demonstrated by substantial evidence of interrelation of operations.

That evidence supports the finding that, in addition to controlling labor relations, Bernard (Oaktree member and principal and TBR president) participated in negotiating sessions, in which he was involved in discussing and approving the Resort's economic package, which included the Resort's position on, *inter alia*, successorship and subcontracting. Bernard was copied on an e-mail from petitioners' outside counsel to the Union's financial secretary-treasurer, with the subject line reading "Re: turtle bay", regarding a draft of "our subcontracting proposal" that had been "reviewed and approved by [Bernard]". Bernard also reviewed financial reports for the Resort and required information from human resources concerning Resort "staff bodies or salaries for an owners['] report".

Also, the lease agreement between Kuilima and TBR was signed for each by Bernard and Porosoff, in their respective capacities as Oaktree principal and senior vice president, legal. The "Landlord" description on the signatory page for that agreement provides: "Kuilima . . . [,] By: Turtle Bay Holding, L.L.C., its general partner[,] By: Oaktree . . . , its manager[,] By: Russel S. Bernard . . . [,] Principal[, and] . . . Marc Porosoff . . . [,] Senior Vice President, Legal". The "Tenant" section on that page similarly provides: "TBR . . . [,] By: Oaktree . . . , its manager[,] By: Russel S. Bernard . . . [,] Principal[, and] . . . Marc Porosoff . . . [,] Senior Vice President, Legal". Further, the management agreement between TBR and Benchmark was signed for TBR by Bernard and

Porosoff, again in their respective capacities as Oaktree principal and senior vice president, legal. Again, beneath TBR's name appears the description: "TBR . . . [,] By: Oaktree . . . , its Manager[,] By: Russel S. Bernard . . . [,] Principal[, and] . . . Marc Porosoff . . . [,] Senior VP, Legal".

Accordingly, neither of these two agreements provide a signature "by" a TBR representative; each is signed "by" an Oaktree representative. Substantial evidence supports the ALJ's finding that having Oaktree representatives sign these agreements on behalf of Oaktree is unusual because "Oaktree was not ostensibly a party to those agreements, unless the parties to those agreements recognized that Oaktree was the entity in control of TBR . . . , Kuilima, and [the Resort]". *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *12.

Porosoff (Oaktree senior vice president, legal, and TBR's vice president and treasurer) assisted in negotiating the management agreement between TBR and Benchmark. In addition, that agreement not only listed TBR as having the same address as Oaktree, but also gave notice that correspondence should be sent to TBR, in care of Oaktree, to the attention of Bernard and Porosoff. Under the terms of the management agreement, TBR was liable for all of the Resort's operating expenses, including payroll and employee benefits, and TBR controlled the bank accounts which Benchmark used for management of the Resort. Section 9.02(c) of that agreement provides that all funds in each bank account used by Benchmark are property of TBR and those funds are controlled by designated TBR signatories, two of whom are Bernard and Porosoff. Further, as provided in the reciprocal trade agreement contract between the Resort and a video-production company, before that company was allowed to film at the Resort, it was required to obtain insurance covering, *inter alia*, "Oaktree Capital Management, . . . individually and as agent".

In sum, substantial evidence supports the finding that "[t]he overbearing presence in these relationships is Oaktree, the effective owner of the resort, which must be consulted, either directly or through TBR . . . before any

significant decisions are made by or at [the Resort], including decisions on labor matters". *Id.* at \*11. Nevertheless, Oaktree contends that, as noted *supra*, we should follow our court's employment-discrimination decision in *Lusk*, 129 F.3d at 780, and hold there was no single-employer relationship. Oaktree fails to acknowledge, however, that, like our decision here, *Lusk* was decided on its own facts (and, as noted *supra*, under a more lenient *de novo* review). *Id.* *Lusk* stated: "[I]t appears that on every occasion in which [the officers working for both the subsidiary and parent] took *any* action in connection with the [layoff] plan, they were acting in concert *only* with other [subsidiary] officials. In fact, the record is replete with examples of how executives from [the subsidiary companies] . . . devised and implemented *every* aspect of the [layoff] plan". *Id.* (emphasis added).

Unlike *Lusk*, substantial evidence does *not* support:  that TBR (the subsidiary), not Oaktree (the parent), was the entity controlling labor relations with the Union; that TBR officers, if there were any that were not also Oaktree officers, were involved with labor relations or details of the Union access and dues-collection issues before us; or that the persons directly involved in preventing Union representatives from accessing the Resort or collecting dues there, were employees of TBR, not Oaktree.

Oaktree also contends:  it can not be found to be an "employer" of Resort employees because it is an investment manager; and, therefore, its only role is to advise Oaktree's investors, who are the Resort owners, but who exercise no day-to-day control over the Resort or any aspect of labor relations. As discussed *supra*, Oaktree was not acting solely as an "investment manager" or "financial adviser"; it was admittedly also acting as an "asset manager". Substantial evidence supports finding the Resort was one of those managed assets.

As Oaktree notes, *Lusk* described as "deficient" any "approaches to piercing the corporate veil which fail to recognize the[] important public policy considerations underlying the doctrine [of limited liability]". 129 F.3d at 777 n.3.

17

"Limited liability prevents a parent . . . from being held responsible for the acts of its subsidiaries unless the separateness of the entities is a sham, and 'there is an absence of an arm's-length relationship among the companies.'" *Romano v. U-Haul Int'l*, 233 F.3d 655, 666 (1st Cir. 2000) (quoting *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999) (holding the "heart of the [single-employer] inquiry is whether there is an absence of an arm's-length relationship")); *DMR Corp.*, 699 F.2d at 791; *Covanta Energy Corp.*, 356 N.L.R.B. No. 98 at \*35. On the other hand, "the fiction of corporate separateness is not sacrosanct. . . . Courts will peer behind the corporate veil if the parent dominates the subsidiary 'to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" *Flowers Indus.*, 814 F.2d at 980-81 (quoting *Krivo Indus. Supply Co.*, 483 F.2d at 1106) (internal citations omitted). For the numerous above-discussed reasons, substantial evidence supports the Board's finding that Oaktree and TBR constituted a single employer.

## C.

In challenging the above-described Union access and dues-collection findings, petitioners maintain the Board failed to hold NLRB to its burden of establishing violations of NLRA § 8(a)(1) and (5). Substantial evidence, however, supports the Board's findings.

NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1), provides that it "shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title" (*e.g.*, to self-organize, form and join labor organizations, and bargain collectively through chosen representatives). Similarly, § 8(a)(5), 29 U.S.C. § 158(a)(5), provides that it "shall be an unfair labor practice . . . to refuse to bargain collectively with the representatives of [an employer's] employees . . . ." Together, these provisions require petitioners to notify and consult the Union before making changes in,

*inter alia*, wages, hours, and conditions of employment. *NLRB v. Pinkston-Hollar Constr. Servs., Inc.*, 954 F.2d 306, 310 (5th Cir. 1992).

At issue are the events on four dates: 14 and 18 February 2004, concerning restricting Union representatives' access to the Resort; and 24 May and 22 June 2004, concerning preventing Union representatives from collecting dues from Resort employees in the employee cafeteria at the Resort. For those dates, the Board found: restricting access and preventing dues collection constituted unfair labor practices. *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *1-2.

As discussed *supra*, a Board decision is upheld if supported by substantial evidence, based upon the record as a whole. *E.g.*, *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007); *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001) ("Substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion."). As also discussed *supra*, the Board's findings of fact, along with its applications of law to facts, are reviewed for substantial evidence; its legal conclusions, such as the interpretation of a CBA provision, *de novo*. *E.g.*, *Strand Theatre*, 493 F.3d at 518.

## 1.

As noted, NLRA § 7, 29 U.S.C. § 157, gives employees the right to self-organize, to form and join labor organizations, "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining . . . ." Along that line, NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5), prevents an employer from making unilateral changes to the terms of employment that are mandatory bargaining subjects without first giving notice to, and bargaining with, employees' representatives—here, the Union. *NLRB v. Katz*, 369 U.S. 736, 742-43 (1962). Consequently, an employer's unilateral change in employment conditions that are under negotiation is equivalent to refusal to bargain when those changes

concern, *inter alia*, wages, hours, and conditions of employment.  *Id.* at 743; *Pinkston-Hollar Constr. Servs., Inc.*, 954 F.2d at 310.

The terms of a CBA inform whether a § 8(a)(5) violation has occurred. Along that line, deference is accorded to the Board's "expertise in interpreting collective bargaining agreements".  *J. Vallery Elec., Inc.*, 337 F.3d at 450 (citation and internal quotation marks omitted).

As discussed, the CBA ended in November 2003; however, as also discussed, the parties agree that its access provision (allowing Union access to the Resort) survived and was in effect while the parties were negotiating a new CBA in 2004.  *See NLRB v. Great W. Coca-Cola Bottling Co.*, 740 F.2d 398, 403-04 (5th Cir. 1984) (employer commits unfair labor practice by unilaterally imposing new access restrictions after contract expiration but while employee-representation question pending).  Accordingly, the CBA access provision was in effect in February 2004, when the events leading to the access-restriction issues occurred.  That provision stated:  "Authorized representatives of the Union shall be free to visit the [Resort] hotel at all reasonable hours and shall be permitted to carry on their duties, provided they shall first notify the management or its designated representative, and there shall be no interference with the normal conduct of business".

Prior to the relevant dates, Union representatives were allowed to frequent, among other places, certain work areas, the lower level of the Resort's hotel lobby, and the employee cafeteria.  On 14 February 2004, Marian Marsh, a Union representative assigned to the Resort, entered it and met with employees in that cafeteria.  Tom Dougher, the Resort's head of security, entered the cafeteria and informed Marsh:  she was not allowed on the Resort property; she was trespassing (because she had received a verbal trespass notice on 12 February, following the public-beach rally); and he had notified the Honolulu Police Department of her unwanted presence at the Resort.  Dougher then directed Resort security officials to escort Marsh off the property.  (Marsh left

before the police officer arrived.) In addition to escorting Marsh from the Resort, Resort personnel gave her a verbal trespass notice, stating that Union representatives were excluded from the property.

On 18 February, two Union representatives, Marsh and Claire Shimabukuro entered the property and met with Resort employees in the employee cafeteria. A Resort security officer: directed them to leave; gave them written trespass notices; and contacted the Honolulu Police Department. Upon arriving and finding that the Union had not disturbed the Resort, the police officer informed Marsh, Shimabukuro, and Resort personnel: Union presence at the Resort fell under the NLRB's jurisdiction; and the Union's alleged trespass was not a criminal matter.

Based upon the foregoing, substantial evidence supports the Board's finding that petitioners committed an unfair labor practice in violation of NLRA § 8(a)(5). That is, there is substantial evidence to support the finding that petitioners denied the Union access to the Resort on 14 and 18 February 2004, which constituted a material change in past practice. Prior to those dates, Union representatives were allowed to frequent certain hotel areas, including the employee cafeteria, to speak with employees and conduct Union business.

Additionally, substantial evidence supports the Board's finding that a § 8(a)(1) violation (unfair labor practice to interfere with rights to, *inter alia*, engage in self-organization, join labor organizations, and bargain collectively) occurred when Union representatives were deprived Resort access on 14 and 18 February 2004. *See TRW-United v. NLRB*, 637 F.2d 410, 415 (5th Cir. 1981) (employer violates NLRA § 8(a)(1) when conduct tends to interfere, coerce, or restrain employees in exercise of § 7 rights). Trespass notices' (verbal and written) being issued and Union representatives' being ordered off Resort property constitute substantial evidence supporting the Board's finding that petitioners violated § 8(a)(1). That is, there is substantial evidence showing that petitioners interfered with Union activities at the Resort. Additionally, as noted

by the ALJ, *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at \*62, petitioners'
acts of contacting police on 14 and 18 February constituted an *ipso facto*
violation of § 8(a)(1). *See, e.g.*, *NLRB v. Consol. Biscuit Co.*, 301 F. App'x 411,
438 (6th Cir. 2008); *Cumberland Farms, Inc. v. NLRB*, 984 F.2d 556, 559 (1st
Cir. 1993).

Although petitioners acknowledge Union access was denied on 14 and 18
February, they contend the access was not "material" and had "no significant
consequences" because the Union was not deprived of access to its employees.
Their position, however, is meritless in the light of substantial evidence showing
the CBA contractual provision was clearly breached on 14 and 18 February. *See,
e.g.*, *Frontier Hotel & Casino*, 309 N.L.R.B. 761, 766-67 (1992) (breach of CBA
contractual provision, designed to protect employees' § 7 rights, is material
change in violation of § 8(a)(1) and (5)); *see also Great W. Coca-Cola Bottling Co.*,
740 F.2d at 403-04 ("[A] unilateral change in the manner and degree of access
afforded . . . employees' representative[s] constitutes a 'basic change' in the
agreement".).

Further, to the extent petitioners assert § 8(a)(1) was not violated because
they were acting on the basis of a reasonable concern (fearful that Union
representatives would disturb the Resort and its guests, in the light of the 12
February disruptive beach rally), substantial evidence supports that position's
being equally unavailing. On 14 February, only Union representative Marsh,
and on 18 February, only Marsh and Shimabukuro, were on the premises when
Resort officials ejected them from the property. Substantial evidence supports
their presence *not* posing a reasonable concern for public safety or business
operations. There was *no* indication that either Union representative interfered
with, or disrupted, the Resort's normal business operations—particularly in the
light of the much larger number of individuals protesting on 12 February. In
fact, one Resort security official informed the police officer on 18 February that
the two Union representatives had *not* then been disruptive.

**2.**

Petitioners claim the Board failed to hold NLRB to its burden of establishing a § 8(a)(5) violation regarding Union dues-collection; specifically, that it failed to establish a past practice for that collection at the Resort.  In that regard, petitioners contend there was no evidence that they unilaterally, and without notice, made a material, substantial, and significant change in a contractual, premises-access provision.  As a threshold matter for this point, petitioners do *not* contest the findings underpinning the ruling that they violated § 8(a)(5) and (1); in other words, they concede they prohibited the Union from collecting dues on 24 May and 22 June 2004.

Petitioners do challenge, however, whether that denial was a departure from past practice.  Determining whether the dues-collection denial was an unlawful, material change requires *de novo* review of the CBA's access provision, according deference to the Board if its decision is reasonably grounded in law and not inconsistent with the NLRA.  *Sara Lee Bakery*, 514 F.3d at 428.

NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees".  The Board adopted the ALJ's findings that:  "collecting dues . . . is within the union access provision that contractually bound [petitioners]"; "[p]reventing the Union from collecting dues at [the Resort] was a material, substantial, and significant change and interference with the Union's access to [the Resort]"; and "[petitioners] unilaterally imposed this change and this restriction on the Union. . . .  [And,] [b]y doing so . . . violated [§] 8(a)(5) and (1) of the [NLRA]".  *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *2, *66.

Before and after the CBA ended in 2003, petitioners deducted Union dues from Resort employees' wages; however, in April 2004, petitioners stopped doing so.  And, on 6 May 2004, petitioners notified the Union that it was prohibited from collecting dues from employees at the Resort.  As a result, on 24 May and 22 June 2004, when Union representatives attempted to collect dues at the

Resort, petitioners prevented their doing so by giving them trespass notices and ejecting them from the property.

As discussed *supra*, although the CBA ended in November 2003, the parties agree that its access provision remained in effect.  Again, it provided: "Authorized representatives of the Union shall be free to visit the [Resort] hotel at all reasonable hours and shall be permitted to carry on their *duties*, provided they shall first notify the management or its designated representative, and there shall be no interference with the normal conduct of business".  (Emphasis added.)  Although there is no precise definition for the term "duties", union access provisions are generally interpreted broadly.  *See generally Gilliam Candy Co.*, 282 N.L.R.B. 624 (1987).  And, the parties do not dispute that "[c]ollecting dues from members is one of the duties of the Union . . . ." *Oaktree Capital Mgmt.*, 353 N.L.R.B. No. 127 at *66; *see Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 754 (6th Cir. 2003) ("Collection of union fees is . . . intricately connected to the right to bargain collectively protected by the NLRB under NLRA § 8(a)(5) . . . ."); *Int'l Union*, 337 N.L.R.B. 237, 241 (2001) (noting dues-collection prohibition interferes with union's ability to fulfill "representative functions").

Accordingly, dues collection, a necessary function and requirement of maintaining representative organizations, guaranteed the Union the right to access the Resort under the existing access provision—the permission "to carry on duties".  Furthermore, substantial evidence supports that:  petitioners understood Union representatives could collect dues, unless they were disorderly or harassing; and those representatives did not interfere with petitioners' normal business operations on 24 May or 22 June 2004.

Therefore, substantial evidence supports the Board's conclusion that preventing dues collection on 24 May and 22 June was a material, substantial, and significant change and interference with the Union's access to the Resort. That evidence is particularly substantial in the light of:  the broad interpretation

24

of access provisions; the general understanding that dues collection is a necessary Union function; and substantial evidence that Union representatives were neither disorderly nor harassing on 24 May or 22 June. *See NLRB v. Am. Nat'l. Can Co.*, 924 F.2d 518, 524 (4th Cir. 1991) ("[W]hen it is found that responsible representation requires union access to the employer's premises, the employer's property rights must yield to the extent necessary to achieve this end without unwarranted interruption of the employer's operations".); *Great W. Coca-Cola Bottling Co.*, 740 F.2d at 403 ("It is clear that access by the employees' representatives constitutes a mandatory bargaining subject, . . . and a unilateral change in the manner and degree of access afforded the employees' representative constitutes a basic change in the agreement." (citations and internal quotation marks omitted)).

## III.

For the foregoing reasons, the petition for review is DENIED and the Board's order is ENFORCED.

EDITH H. JONES, Chief Judge, dissenting:

With due respect to the meticulous opinion for the majority, I cannot agree with the NLRB's imposition of liability on Oaktree Capital Management, L.P., an investment adviser, for labor law violations committed by Turtle Bay Resorts (TBR) and Benchmark Hospitality, the resort lessor/operators. NLRB cites no authority that applies the "single employer" theory to an investment adviser/manager. *See Oaktree Capital Management, L.L.C.*, 353 NLRB No. 127 (2009) (adopted by the Board by reference in *Oaktree Capital Management, L.L.C.*, 355 NLRB No. 147, at *1). Although the Board's use of the single employer theory has been sanctioned by the Supreme Court in two narrow instances, more recent pronouncements demonstrate the Court's fidelity to enforcing corporate separateness, a doctrine on which much of our current economy depends to safeguard risk-taking and investment. The Board's use of single employer theory in this case is gratuitous and unnecessary inasmuch as TBR and Benchmark together are indisputably joint employers whose ability and motivation to comply with the Board's order are not in doubt.[1]

---

[1] In response to the majority's focus on the substantial evidence standard of review, *Majority* at 8, I note that as applied to this case, the single employer theory itself is unjustifiable. The NLRB's interpretation of the NLRA, its governing statute, is ordinarily due *Chevron* deference. *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536-37 (1992). Courts give no deference to the NLRB, however, if its interpretation "rest[s] on erroneous legal foundations," *Id.* at 539 (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956)), or the NLRB's position is an unreasonable interpretation of the Act. *First Healthcare Corp. v. NLRB*, 344 F.3d 523, 546 (6th Cir. 2006). Given the recent Supreme Court precedent on the corporate form, the NLRB's extension of the "single employer" doctrine is on shaky legal ground. The NLRB's unprecedented attempt to disregard the complex corporate structure in the instant

The Board's single employer theory evolved from a rule regulating the jurisdictional limit of the NLRB, *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255 (US 1965), to one concerned with various manipulations of traditional intracorporate relationships that, deliberately or not, evaded federal labor law. *S. Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800 (1976). The Board's four part test to assess single employer liability[2] is thus understandably a somewhat lower bar than the common law doctrine necessary to pierce the corporate veil. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) (noting that "[t]he doctrine of piercing the corporate veil . . . is the rare exception, applied in the case of fraud or certain other exceptional circumstances"); *Vance v. NLRB*, 71 F.3d 486, 490-91 (4th Cir. 1995) (noting that piercing the corporate veil generally requires unlawful motive or intent while finding single employer status requires no such finding).

Taken too generally, however, the elements of the NLRB test would impose responsibility on virtually any corporate parent for subsidiary or affiliate actions, because the subsidiary is ultimately accountable to its parent company and because they often share common employees or officers. But a unanimous

---

case is unreasonable especially given the facts in this case where a culpable and solvent subsidiary is not denying liability.

[2] The four part test to determine "single employer" status includes the following considerations: "interrelation of operations, common management, centralized control of labor relations and common ownership." *Radio & Television Broad. Technicians*, 380 U.S. at 256.

Supreme Court has recognized that "it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998). Indeed, the Court relied on this court's decision in *Lusk v. FoxMeyer Health Corporation,* 129 F.3d 773, 779 (5th Cir. 1997), observing the "well established principles" that not only do such officers frequently "change hats" in representing a parent or subsidiary, but courts "generally presume 'that they are wearing the "subsidiary's hat" . . . when acting for the subsidiary.'" *Bestfoods*, 524 U.S. at 69. Even more recently, the Court refused to affix liability on an investment adviser under federal securities law for misleading statements made by a fund administered by the advisor. *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2305 (2011). The majority declined "to disregard the corporate form" because the entities maintained legal separateness and followed corporate formalities, *id.* at 2304, even though all of the officers of the fund were also employees of the advisor, *id.* at 2306 (Breyer, J., dissenting).

The Board's reliance on the single employer theory to conflate "Oaktree" and TBR bears no relation to the corporate structure of the entities and even less to labor law policy. On the latter score, it is clear that TBR, rather than being a mere "shell", as alleged by the Board in *Oaktree Capital Management, L.L.C.*,

28

353 NLRB No. 127, at *11 (2009), was the financial center for the resort,[3] while Benchmark had a contract for day to day management. Only on-site employees took the actions that became the subject of the Board's findings of unfair practices. Together, as an admitted joint employer, TBR and Benchmark were fully accountable, solvent and responsible parties for the Board's purposes. No obvious labor law policy is being served by holding Oaktree liable in addition.

How the Board applied the single employer theory, however, is as unfortunate as its lack of policy grounding. First, Oaktree did not "own" TBR or even stand within the corporate chain that leads back to the investment funds for which Oaktree LP is the general partner. This chart portrays the complex, albeit hardly extraordinary, corporate structure.

---

[3] All revenues from the operation of Turtle Bay Resort are deposited into an account controlled by TBR and TBR is liable for all operating expenses. *Oaktree Capital Management, L.L.C.*, 353 NLRB No. 127, at *11.



Oaktree, despite being an investment adviser and asset manager to the funds and involved in managing TBR, holds no direct ownership of the resort as evidenced by the chart above. NLRB simply erred, as the majority opinion almost admits. Thus, to conclude that TBR was a "conduit", *id.* at *12, for Oaktree has no legal significance. There is no evidence disputing TBR's financial independence as the resort's lessor or that corporate formalities within the members of the ownership chain were ignored.

Second, the NLRB's finding of "common management" between Oaktree and TBR proves nothing more than is allowed by "general principles" of corporate law, as emphasized by the Supreme Court. The majority opinion elaborates on this element of NLRB's test by stating, inter alia, that Russell Bernard, President of TBR, was also a principal in Oaktree and "portfolio manager" for the investment funds; and the majority concludes that Bernard was "acting on Oaktree's behalf in controlling the Resort's labor relations." This conclusion is unsupported by evidence showing why or how "Oaktree" directly benefitted from controlling the resort's labor relations. In other single employer cases, the "common management" criterion demonstrates that a corporate parent, or sibling, will benefit by the closing down of one (unionized) operation; shifting operations from a union to non-union subsidiary; or otherwise reorganizing the company to the detriment of a union contract. *See., e.g.*, *NLRB v. O'Neill*, 965 F.2d 1522, 1525-26, 1530 (9th Cir. 1992) (finding that an owner shut down his union factory only to use other entities he owned to reopen the factory without union workers). Not so here. In fact, nothing distinguishes the NLRB's finding against "Oaktree" from a finding it could equally have made against the Funds themselves: Oaktree, after all, is general partner of two of the funds and adviser to the third! NLRB has inverted the Supreme Court's

proposition in *Bestfoods* that corporate officers or managers may indeed wear two hats, and are presumed to wear the proper hat, in attending to their dual duties.

Third, the most important element of the test is centralized control of labor relations. *Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 752 (7th Cir. 2001); *O'Neill*, 965 F.2d at 1529. The majority rely on just two pieces of correspondence, one in which Bernard reported to the Funds on the status of labor negotiations (in response to a letter sent by the Union to the Fund investors), and one sent by the Union to Bernard on a similar subject. Yet Bernard was authorized to wear separate hats in reporting as the funds' investment adviser, on one hand, and dealing through TBR, on the other. Moreover, in the absence of some scheme to deceive the Union as to the identity of the "employer," how the Union addresses Bernard should not be probative against Oaktree. The "control" exhibited for purposes of these violations, however, had nothing to do with Bernard's correspondence. All violations were committed by employees on the premises at Turtle Bay (eg, the resort's director of human resources, the security chief, Benchmark's general manager, resort restaurant managers). *Oaktree Capital Management, L.L.C.*, 353 NLRB No. 127, at *53-86. None of the violations were committed by or at the behest of Bernard

and other "Oaktree" personnel headquartered in New York. That there is no evidence linking "Oaktree" to the retaliatory acts of on-site management personnel for the union's extremely disruptive conduct speaks loudly to the lack of "centralized" labor relations between Oaktree and TBR.

And this lack of evidence stands in stark contrast to the traditional cases in which NLRB has applied the single employer test. In prior cases, the uniform theme is that one integrated company in an integrated business is managing overall labor relations among the related entities in order to disadvantage a union and directly benefit its bottom line. *See, e.g., Covanta Energy Corp.*, 356 NLRB No. 98 at \*34, 38 (2011) (finding that the subsidiary was an integrated part of the corporate parent and that this integrated employer discontinued paying corporate bonuses to workers to discourage union activity). Here, there is no "centralization" of the enterprise. Oaktree's business is the management of some $80 billion in forty investment funds for clients like universities, charitable trusts, and public and private pension funds. *Global Presence*, OAKTREE, http://www.oaktreecapital.com/about/global-presence.aspx (last visited Sept. 12, 2011). The Resort's business, managed by TBR/Benchmark, is unrelated functionally to that of Oaktree. There is no

No. 10-60749

"there" behind the conclusion that management of the Resort's labor relations was centrally controlled by Oaktree.

The final element of NLRB's test, as related by the majority, is operational integration. The majority supports the NLRB's conclusion with reference, again, to the overlap between Oaktree representatives and TBR's management. Even if this is so, and even if Oaktree "operated" TBR, and TBR, along with Benchmark, ran the Resort, this is not the type of "operational integration" contemplated in the NLRB's prior cases. Oaktree created or used TBR as a self-sufficient corporate vehicle for an individual investment opportunity. It had no integrated relationship with other resort properties that could be affected by Turtle Bay's unions or could disadvantage those unions. Yet it is the overall consequence for the integrated operation to which NLRB has looked in the past and that alone justifies ignoring the integrity of corporate relations.

I reiterate one major point. There is no dispute that together, TBR and Benchmark Hospitality are solvent, responsible and liable parties. Fixing additional liability on an unrelated corporate entity, Oaktree, was wholly superfluous. The cost of discarding the corporate form is not justified when no labor law policy is advanced. For all these reasons, the shell of the NLRB's test appears to be intact, but the substance of the test—and its connection with the

No. 10-60749

purposes of federal labor policy—are absent.  I respectfully dissent from the
enforcement of the Board's order against Oaktree.