**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MOORE BUSINESS FORMS, INC., Respondent.**

**No. 77-1135.**

United States Court of Appeals, Fifth Circuit.

June 8, 1978.

Elliott Moore, Dep. Assoc. Gen. Counsel, Paul J. Spielberg, Supervisor, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Ruth E. Peters, Atty., N. L. R. B., Washington, D.C., for petitioner.

Franklin R. Sears, Fort Worth, Tex., for respondent.

Before COLEMAN and FAY, Circuit Judges, and KING,* District Judge.

COLEMAN, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order that Moore Business Forms, Inc., Heflin, Alabama, violated §§ 8(a)(1) and (3) of the National Labor Relations Act. Moore cross petitions to set aside the order. We enforce in part.

On November 9, 1973, the International Printing and Graphic Communications Union, AFL–CIO, was certified at Moore's plant in Heflin. Between that date and March 25, 1974, the company and the union met five or six times in fruitless contract negotiations. On March 25, most of the employees struck in support of the contract demands.

From the very outset, the situation was deplorably marred by conduct which was violent or bordering on violence. Broken glass, nails, and pieces of metal were strewn across entrances to the plant and to the employee parking lot. In all, about 95 pounds of nails were cleared from around the plant. Rocks and other objects were thrown at non-striking employees. Missiles were thrown from slingshots at company cars, employee cars, and plant buildings. Pickets harassed non-strikers by throwing eggs at their automobiles and calling them obscene names. Guns were fired at homes of non-strikers. *The plant itself was hit by gunfire and bombed with dynamite.* Gunfire damaged electrical transformers serving the plant. On the night of April 25 some twenty gunshots were fired from the direction of strike headquarters into the plant entrance. The dangerous atmosphere was perhaps epitomized by a sign posted near the plant main entrance notifying non-strikers to "Enter at your own risk".

The company employed a private guard service to protect the plant. Guards and company supervisors maintained constant surveillance of the picket line. A strike file was kept, reciting striker misconduct as reported by guards, supervisors and non-striking employees. From this file the company determined that 31 strikers had been guilty of strike misconduct. On April 11, letters of termination were sent to these 31, citing strike misconduct as the reason for termination.

On June 21 the company took action against strikers it believed had been involved in the serious shooting incident on April 25. Two supervisors, who were in the plant lobby at the time the entrance was hit by gunfire on the 25th, swore out criminal complaints against all the strikers who had been seen in the area of the strike headquarters prior to the shooting and who had not been seen leaving the area before the shooting started. These additional strikers were suspended in accordance with company policy of suspending any employee charged with a felony.

Prior to the strike, Moore operated three shifts at the Heflin plant. Employees were regularly rotated between the shifts so that no employee was permanently assigned to an undesirable shift. When the strike began in March, the company was forced to reduce to a single shift and so operated until enough employees returned to work to allow a second shift on June 10. On July 15 a third shift was added. Without regard to seniority, strikers returning to work after June 10 were permanently assigned to the second shift and, when that was filled, to the third shift. After the strike ended,

* District Judge of the Southern District of Florida, sitting by designation.

Moore did not return to the practice of rotating shifts. This meant that those employees who had participated in the strike were forced to work the less desirable hours while non-strikers kept the most desirable hours.

Prior to the strike, Moore provided group medical insurance to its employees, but all employees who joined the strike were removed from coverage. When the strikers returned to work, the company required them to wait three months before reinstating their health insurance coverage, in effect treating them as if they were new employees.

After three weeks of testimony, filling over 2100 pages, the Administrative Law Judge found that the April 11 discharges (31 employees) converted the economic strike into an unfair labor practice strike and ordered that nineteen of those discharged on the eleventh be reinstated with back pay. He also ordered reinstated those strikers suspended as a result of the April 25 shooting incident, reasoning that it was "bootstrapping" for the company to rely on criminal charges it caused to be filed as the basis for the suspensions. The Judge also concluded that the company's suspicions (as he termed it) provided no basis for an honest belief that the charged employees engaged in the shooting on April 25.

The Administrative Law Judge found that the company violated Section 8(a)(3) of the Act with the institution of fixed shifts and the treatment of returning strikers as new employees for the purpose of health insurance. He ordered the company to reinstate the practice of rotating shifts and make whole all striking employees for any losses suffered for lack of health insurance.

The National Labor Relations Board affirmed the findings and conclusions of the Administrative Law Judge and adopted his recommended order.

Moore Business Forms, Inc. argues that substantial evidence on the record as a whole does not support the Board's finding that the company violated the Act by its discharge of 26 strikers, 19 on April 11 for strike misconduct and 7 in June for their alleged participation in the April 25 shooting. The company argues, in addition, that the Board improperly found that the company violated the Act by discontinuing its practice of rotating shifts in favor of fixed shifts and by requiring striking employees who returned to work to undergo a 90-day waiting period before reinstating their health insurance coverage.

### The April 11 Discharges

The general counsel's complaint against Moore charged that 24 of the 31 employees discharged on April 11 had been wrongfully discharged. Moore presented evidence of the alleged misconduct of the 24 at the hearing before the Administrative Law Judge. The Administrative Law Judge determined that five of the employees named in the complaint were guilty of misconduct warranting discharge, but ruled that 19 of the 24 strikers had been wrongfully discharged in violation of Section 8(a)(1) of the National Labor Relations Act.

In the opinion of the Administrative Law Judge, seven of the nineteen employees engaged in some "minor" misconduct, insufficient to warrant discharge, while the company failed to prove that the remaining twelve engaged in any misconduct. He sought to base his determinations as to each of these twelve as matters of credibility, generally ascribing credibility to the denials of the strikers (often unsupported by anything but their own word) while discrediting the testimony of the company witnesses.

Rarely, if ever, has this Court been called upon to review a strike situation in which so much continuing, pervasive violence admittedly took place as that which occurred at Heflin. We do not sit for the vindication of those who resort to violence in labor disputes or any other activity. We condemn it, and we emphatically decline to lend aid to those participating in it. Conversely, we must be equally careful of the legal rights of those not actually shown to have been guilty participants. Our major problem with this case stems from two con-

siderations: (1) we do not sit as a fact finding court and may not overturn Board findings which are supported by substantial evidence in the record as a whole and (2) the company left gaps in its proof which it might have filled but did not.

In any event, as will later appear, we deny reinstatement to some of those whom the Administrative Law Judge exonerated and we have no choice but, sometimes *with great reluctance,* to enforce it as to others.

Before getting to the individual cases, however, we consider it appropriate first to dispose of some of the legal issues involved.

### Was the Economic Strike Converted into an Unfair Labor Practice Strike?

Moore argues that the April 11 discharge did not convert the economic strike into an unfair labor practice strike, the point being that in such event Moore could not be ordered to rehire any strikers who were permanently replaced before making an unconditional offer to return to work and, moreover, would not be liable for back pay. Moore says it acted in good faith, honestly believing that the discharged strikers were guilty of serious strike misconduct.

■ It is clear, however, that an employer's good faith is not a defense to a violation of the Act. "Over and again the Board has ruled that § 8(a)(1) is violated if an employee is discharged for misconduct arising out of a protected activity, despite the employer's good faith, when it is shown that the misconduct never occurred." *N. L. R. B. v. Burnup and Sims, Inc.,* 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964).

■ Our consideration does not end here however, because a violation of the Act alone does not convert an economic strike into an unfair labor practice strike. It is necessary that the employer's unfair labor practice prolong the strike. *Allied Industrial Wkrs., AFL–CIO Loc. U. No. 289 v. N. L. R. B.,* 1973, 155 U.S.App.D.C. 112, 476 F.2d 868; *N. L. R. B. v. Birmingham Publishing Company,* 5 Cir. 1958, 262 F.2d 2. The employer's unfair labor practice need not be the sole or even the major cause or

aggravating factor of the strike; it need only be a contributing factor. *Larand Leisurelies, Inc. v. N. L. R. B.,* 6 Cir. 1975, 523 F.2d 814.

■ The evidence shows that the union representative told Moore's counsel subsequent to April 11 that "31 new issues" had been created by the company and that reinstatement of the 31 was a condition for settlement of the strike. But on the other hand the company counsel refused to submit the discharges to arbitration, as later suggested by the union, and steadfastly maintained that the only way any of the 31 would return to work was by order of the N.L.R.B. The company argues that the union alone was responsible for prolonging the strike by demanding that Moore rehire *all* 31 discharged strikers as a condition to settling the strike. Moore contends that since *some* of the strikers were guilty of misconduct and thus properly discharged the company was justified in refusing to rehire those strikers. But what Moore overlooks is that both sides were equally adamant over the question of the 31; the intransigence of the union was matched by the company and created an impasse. Regardless of which side displayed greater intransigence over the issue of the 31, it cannot be questioned that the company's discharge of these strikers did create an additional issue, aside from the economic differences, and did contribute to the antagonisms of the strike and ultimately prolonged the strike. The Board's finding that the April discharges converted the economic strike into an unfair labor practice strike is supported by substantial evidence and will be upheld on review.

### Fixed Work Shifts and Medical Insurance

The institution of fixed work shifts insured that virtually all returning strikers were permanently assigned to the less desirable second and third shifts. The strikers who came back to work early, the employees who did not strike, and the workers hired to replace strikers were permanently assigned to the more desirable first shift. The Board found that the institution of

fixed shifts, over the opposition of the union, operated to discriminate between strikers and non-strikers and had a destructive impact upon the strike.

■ Although Moore argues in its brief that it had the right to institute fixed shifts if motivated by a legitimate business reason, the company at the hearing did not present any evidence of a legitimate business motive.[1] Moreover, even if an employer claims that his actions are taken with a legitimate business end in mind, and not due to a discriminatory motive, some conduct will have an unavoidable discriminatory effect, and carry its own indicia of intent.

[T]he employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. Nevertheless, his conduct *does* speak for itself—it *is* discriminatory and it *does* discourage union membership and whatever the claimed overriding justification may be, it carries with it unavoidable consequences which the employer not only foresaw but which he must have intended.

*N. L. R. B. v. Erie Resistor Corp.,* 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963).

■ The institution of fixed shifts necessarily operated to the detriment of those who participated in the strike as compared to those who did not. It served as an inducement to strikers to abandon the strike early in order to avoid the least desirable third shift, weakening the union's strike effort. Despite Moore's claim of a legitimate business purpose, its conduct *does* speak for itself—it *is* discriminatory and it *does* discourage union membership. In the absence of a showing of an "overrid-ing business purpose justifying the invasion of union rights", *N. L. R. B. v. Erie Resistor Corp., supra,* 373 U.S. at 231, 83 S.Ct. at 1147, the company's institution of fixed shifts violated Sections 8(a)(1) and (3) of the Act.

### Medical Insurance

■ The Board also found that Moore committed an unfair labor practice in the manner which it applied its medical insurance benefit to the returning strikers. For purposes of the medical insurance only, Moore treated those strikers as new employees, requiring them to wait 90 days before reinstituting their coverage. The Board called this practice inherently destructive of employees' rights.

Medical insurance was a free employee benefit provided by Moore. Employees paid no part of the premium cost. Shortly after the strike began Moore stopped the premiums for the striking employees. The company argues that when strikers returned to work it had to choose between treating the strikers as new employees or as employees who had elected to drop their coverage. Under the insurance contract, new employees were required to wait 90 days before being covered while employees who had dropped their coverage had to wait until the next policy anniversary date (January 1) to reinstate their coverage. Since most strikers had returned to work by July, the company's choice appears to be to the striker's benefit, rather than detriment.

The Administrative Law Judge and the Board found, however, that the company did not have to require *any* wait before reinstating coverage. Mr. W. L. Murrell, Industrial Relations Manager for the Southern Division of Moore Business Forms, Inc., testified that the company considered the strikers to remain employees throughout

---

1. The practice of rotating shifts was abandoned when the company was forced to cut back to a single shift when the strike started. Workers were not rotated among shifts after a second shift was added on June 10 and a third shift on July 15. While an argument can be made for continuing fixed shifts as long as new replacement workers were being trained, no showing was made by Moore that the continuation of fixed shifts was necessitated by any legitimate business objective after the strike ended and new employees had been trained.

the strike.[2] He explained that the 90-day waiting period for new employees was a company personnel policy, and that the insurer "couldn't care less" about a waiting period. [R. 617] Mr. Murrell further testified that in the event the company defaulted on an employee's premium, the policy would simply be reinstated upon subsequent acceptance by the insurer of a premium payment. No showing was made that Moore was precluded from reinstating medical coverage for each striker simply by making a premium payment immediately upon that striker's return to work.

The company's action of paying medical benefits for non-striking employees while denying, for 90 days, the same benefit to employees who had participated in a strike had a discouraging effect on both present and future concerted activities. As with the institution of fixed shifts, we find this company action to be inherently destructive of employee interests carrying its own indicia of intent. Moore had the burden of explaining or justifying its actions. *N. L. R. B. v. Erie Resistor Corp., supra.* Without such an explanation by Moore that a legitimate business end was served by the waiting period requirement, the company's action constituted an unfair labor practice.

### The April 25 Shooting Incident

█ At about 11 p. m. on April 25 a light was shined from a car in the area of the strike headquarters through the front doors of the plant and into the lobby. Two company managers and a Pinkerton guard were inside the lobby when the light was turned on. They moved back, out of the lobby, just before some twenty rifle shots were fired through the front door. A deputy sheriff arrived at the scene almost immediately but found no evidence as to who fired the shots.

The company supervisors had been maintaining the strike file that evening. The time each striker was seen arriving and the time of his departure was logged into the file. The only source of any other light in the strike headquarters area was a barrel fire which the strikers kept burning for heat. Several roads led to the rear of the strike headquarters by which strikers could come and go without being observed from the plant. After the shooting, the company compiled a list from the strike file of each striker who was observed arriving at the headquarters before the shooting and not observed leaving before the shots were fired. This list included eleven strikers named in the General Counsel's complaint.

On June 21, pursuant to the instructions of Moore's labor counsel, the two company supervisors who were in the lobby at the time of the shooting swore out criminal complaints charging assault with intent to commit murder against each of the strikers listed. The strike file was the only "evidence" linking the named strikers with the incident. Moore had a policy that any employee who is charged with a felony is suspended until he is cleared of the charge. Each of the strikers involved was suspended in accordance with this policy.

The Administrative Law Judge ruled that the suspensions violated Section 8(a)(1) of the Act. In doing so, he noted the lack of precision in the strike file log, the very limited light available for identifications in the strike area, and the fact that persons could come and go by way of the rear roads without being observed from the plant. He concluded that the company lacked a basis for an honest belief that the charged strikers were responsible for the shooting. The Administrative Law Judge called the company's action of charging an employee with a felony and then suspending that employee because he was charged with a felony "bootstrapping".

We are compelled to agree with the Board that there was no evidence specifically connecting any of the charged employees

---

2. The law in fact provides that a striker remains an employee throughout a strike. The National Labor Relations Act, as amended, § 2(3), 61 Stat. 137, 29 U.S.C. § 152(3), declares: "The term 'employee' . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute . . . and who has not obtained any other regular and substantially equivalent employment . . . .".

with the actual shooting. The company evidence, at best, only placed the employees in the proximity of the misconduct. In the absence of proof identifying striking employees directly with misconduct, mere proximity to the violence is insufficient to deprive a striker of his right to reinstatement. *N. L. R. B. v. Marshall Car Wheel & Foundry Co.*, 5 Cir. 1955, 218 F.2d 409; *N. L. R. B. v. Cambria Clay Products Co.*, 6 Cir. 1954, 215 F.2d 48.

### Employees to be Reinstated

As to those employees ordered reinstated we do not prolong this opinion, or enhance its prolixity, by an extended discussion. Suffice it to say that after oral argument we ordered, and thereafter read, the voluminous transcript of the hearings before the Administrative Law Judge. Our decision to enforce the Board order as to the employees hereinafter specified reflects only our determination that as to them the order is founded on correct legal principles and supported by the record as a whole. This is not to say that these employees were, in our opinion, Simon-pure. As to several of them, we may deduce that evidence sufficient to permanently discharge them must have been available in admissible form but the company simply did not come forward with it.

We enforce the Board order as to all employees therein named for reinstatement and back pay except those hereinafter specifically discussed, with a denial of enforcement.

### Employees as to Whom the Board Order Will Not Be Enforced

It is well settled that our *factual* review is limited to a determination of whether the Board's conclusions are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N. L. R. B. v. Houston Natural Gas Corp.*, 5 Cir. 1973, 478 F.2d 467. If the evidence before the Board is conflicting, and the Board's decision rests on credibility, then we are bound by the credibility choice.

*Helena Laboratories Corp. v. N. L. R. B.*, 5 Cir. 1977, 557 F.2d 1183; *Nabors v. N. L. R. B.*, 5 Cir. 1963, 323 F.2d 686.

▮ If, however, the credibility choice is based on an inadequate reason, or no reason at all, we are not compelled to respect it, and shall not do so. Obviously, if the order is based on an invalid legal reason it will not be enforced.

### Stanley Bragg

▮ Artice Albright, a non-striking employee, testified that he was driving to work on Highway 78 on the morning of April 1, when Stanley Bragg overtook and passed him. Bragg then slowed down in front of Albright, but would speed up and swerve across the road when Albright attempted to pass. Bragg then positioned his vehicle across the road, blocking the highway. When Albright approached the roadblock, Bragg motioned for Albright to turn around and go back. After waiting several minutes for Bragg to move, Albright turned his car around and drove back down Highway 78, proceeding to the plant by an alternate route. There was no contact between the vehicles, and no words were spoken between Albright and Bragg during the incident. [R. 693–694]

Bragg testified that he was merely trying to stop Albright in order to speak with him, that he did not stop his car in the middle of Highway 78, as Albright testified, but was simply making a slow turn off the highway. [R. 1446]

The Administrative Law Judge credited Albright's testimony but found the incident insufficiently serious to warrant Bragg's discharge. [R. 2190]

As a matter of law, we cannot agree with this conclusion. Albright had no right to accost, pursue, block, or otherwise interfere with the right of any citizen in the use of the public highway while attempting peaceably and lawfully to go to work.

Enforcement of the NLRB order as to Stanley Bragg is denied.

### Nelda Morrow

 Morrow threw an egg against a pickup truck owned by non-striker Ronald Skinner. Morrow admitted throwing the egg, but testified that she threw the egg because she was startled when Skinner pulled his truck into the parking lot behind her, almost hitting her. Morrow stated that she was not "rational" when she threw the egg, and that it was only a reflex action. [R. 1654] Skinner testified that the egg was raw and ran down the truck's window, while Morrow claimed that the egg was hardboiled, and that she had brought it as a mid-morning snack.

The Administrative Law Judge was satisfied that Morrow had thrown the egg at Skinner's truck. He ruled that the egg throwing was merely impulsive or exuberant behavior, insufficiently serious to warrant discharge. [R. 2176]

We decline to accept the Administrative Law Judge's legal appraisal of this egg throwing incident. The Board order as to Morrow will not be enforced.

### Larry Smith

 Larry Smith was discharged by the company for his alleged involvement in five separate incidents. First, Smith backed his pickup truck into the fence around the company parking lot, damaging one of the posts. There was no evidence to show that this was other than an accident. Secondly, the company claimed that Smith "staged" being struck by the car of a non-striking employee as it came into the company parking lot. Smith later charged the driver with assault. [R. 1850–1856]

Smith's third incident involves several other strikers who together stopped a company delivery truck on the road to the plant. The driver testified that the strikers asked him not to make his delivery to the plant. While the driver was away from the truck, telephoning the plant manager, someone threw a large iron bolt through the truck's windshield. No evidence showing who threw the bolt was produced at the hearing. [R. 1162–1166]

Two statements by Smith were cited by the company as justifying his discharge: one, to a non-striker as he came out from the plant that "he better enjoy it today because he won't have another day up here", [R. 1223] and another to two company supervisors as they picked nails up off the parking lot that there would be "two nails at home in your driveway for every one you pick up". [R. 197]

The Judge ordered Smith reinstated, holding all of the incidents insufficiently serious to warrant discharge. He called the automobile accident "horseplay", and the nail threat not so serious as to warrant discharge. [R. 2196]

As to the nail threat, this is patently wrong and we decline to give it our stamp of approval. Enforcement is denied.

### Larry Turner

 Three incidents were listed by the company as reasons for Turner's discharge. A company supervisor, Howard Shockley, testified that he witnessed Turner throw broken glass and nails into the company parking area. [R. 204] Next, a Pinkerton guard claimed that Turner threw a small wooden block at him, but that he was able to step out of the way. [R. 491] The company truck driver testified that Larry Turner was among those that stopped his truck and asked him not to make his delivery to the plant. [R. 1156]

Turner denied throwing nails or glass at any time on the picket line [R. 1944–1945, 1953], and denied throwing a block at the Pinkerton guard. [R. 1944–1945]

The Administrative Law Judge did not make a factual determination whether Turner threw the block or not, instead saying that even if it did occur it was only horseplay and not serious. The Judge discredits Shockley's testimony about the nail throwing because of the early morning hour (a little after 6:00 a. m.) and the distance at which Shockley observed the nail throwing (200 feet). This strikes us as being an entirely ephemeral basis for discrediting this testimony.

Again, as to his *conclusions*, we must disagree with the Administrative Law Judge. Turner is not entitled to reinstatement with back pay.

### Danny White

■ M. Dennis Green, a non-striking employee, testified that White asked him why he was going to work. When Green responded that he had to, White stated "there's ways to keep you from it". [R. 1226]

The Judge credited Green's testimony, but ruled that the statement was ambiguous, not a serious threat of harm, and only picket line braggadocio—not warranting discharge. [R. 2194]

As we view it, there was nothing ambiguous about this threat. Green was going to be stopped. The method was not stated, but in all the violent behavior surrounding this strike the threat really left nothing to the imagination. Enforcement as to White is denied.

### Leroy Brown

■ Employee Reeves testified that as she was driving away from the plant one day Brown shook a stick at her and told her not to come in the next day or the stick would be used on her. A passenger in the car with Reeves heard Brown tell Reeves not to come in the next day, but didn't hear Brown say that the stick would be used on Reeves if she did come in to work. [R. 906–907, 912–913]

Brown denied making any statement whatsoever to Reeves. [R. 1980–1982]

The Judge found that Brown did speak to Reeves and did have a stick in his hand when he spoke to her. He further found that Brown told Reeves not to come in the next day, but did *not* threaten to use the stick on her. The Administrative Law Judge ruled that the incident, at the most, presented no real harm or direct threat of harm and was not serious enough to warrant Brown's discharge. [R. 2184]

In the violent context of this strike we cannot say that the views of the Adminis-

trative Law Judge are supported by the record and we deny enforcement as to Leroy Brown.

### Ralph Johnson

■ Besides the testimony of Shockley and Parker that Johnson threw or placed nails on company property, supervisor Vernon Sanders testified that he saw Johnson pulling nails out of his pocket and strewing them over the road leading into the parking lot. [R. 405]

Johnson took the stand and flatly denied ever throwing nails on the picket line. [R. 1920]

The Administrative Law Judge simply credits Johnson's denial over Sanders' testimony. The Judge mentions the demeanor of the witnesses and the fact that out of twelve pickets present when Johnson allegedly strew the nails, Sanders could remember only Johnson. [R. 2189] The fact is, however, that Sanders did remember Johnson and his inability to remember the names of the other pickets present (who apparently were throwing no nails) is no basis for rejecting his testimony, corroborated by that of two other witnesses. Enforcement as to Ralph Johnson is denied.

### Dorris Payne

■ During a conversation with non-striking employee Rollins, Payne asked if Rollins' wife and children were safe. Rollins testified that Payne also said "I thought you had more sense than that", which Rollins inferred to mean more sense than to endanger his family by crossing the picket line to work. A third person, standing nearby, overheard Payne asked Rollins about his family, but did not hear any type of threat. [R. 1811]

Payne admitted speaking to Rollins, but denied making any threat.

The Administrative Law Judge credited Payne's version of the conversation with Rollins and stated moreover that the statement, even if Rollins' version were accurate, would be too ambiguous to constitute a threat serious enough to warrant dis-

charge. We disagree and deny enforcement as to Dorris Payne.

### Conclusion

The Order of the Board will be Enforced in part and Denied Enforcement in part, as hereinabove set forth.