# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 22, 2021

Lyle W. Cayce
Clerk

No. 20-61072

New York Party Shuttle, L.L.C., *doing business as* Onboard Tours; Washington DC Party Shuttle, L.L.C., *doing business as* Onboard Tours; OnBoard Las Vegas Tours, L.L.C., *doing business as* Onboard Tours; NYC Guided Tours, L.L.C.; Party Shuttle Tours, L.L.C.,

*Petitioners/Cross-Respondents*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Petition for Review of an Order and Decision of the
National Labor Relations Board
NLRB No. 20-61072

Before Clement, Southwick, and Willett, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

After New York Party Shuttle, LLC ("NYPS") fired Fred Pflantzer for attempting to unionize, the NLRB held an unfair labor practice proceeding. The Board concluded that NYPS committed an unfair labor practice and ordered NYPS to reinstate Pflantzer and make him whole. NYPS appealed the Board's liability finding but failed to file an opening brief;

thus, we entered a default judgment against NYPS.  The Board then held a compliance proceeding to determine damages.  At that proceeding, an ALJ awarded some $91,000 in backpay to Pflantzer.  Petitioners now appeal the Board's backpay award, arguing multiple grounds for reversal.  We affirm in part and reverse and remand in part.

I.

NYPS provided sightseeing bus tours in New York City.  In October 2011, NYPS hired Fred Pflantzer to serve as a tour guide.  As a tour guide, Pflantzer conducted three to four tours a week, with each tour lasting five to six hours.  He was paid $20 an hour and approximately $35 in tips.  Pflantzer also created his own tour company, New York See Tours, which he operated exclusively on Saturdays that he was not working for NYPS.  In February 2012, NYPS terminated Pflantzer.

Following Pflantzer's termination, the NLRB held an unfair labor practice proceeding.  According to NYPS, Pflantzer was an independent contractor who was discharged after management learned that he was operating a competing business.  The NLRB rejected NYPS' version of events and instead determined that Pflantzer was an employee who was fired for talking to fellow employees about unionizing in violation of 29 U.S.C. § 158(a)(3) and (1).  Based on this finding, the Board ordered NYPS to reinstate Pflantzer and make him whole.  NYPS timely appealed.

On its unfair labor practices appeal, NYPS failed to file its opening brief.  The court consequently entered default judgment against NYPS, thereby affirming the Board's 2013 merits order.  It then denied NYPS'

subsequent motion for reconsideration. With the 2013 merits order affirmed and the mandate issued, the NLRB advanced to the compliance proceeding phase to determine damages.

During the compliance proceeding phase, the Board's regional director issued a compliance specification. The specification calculated the backpay NYPS owed Pflantzer. In the third amendment to the compliance specification, the director asserted that New York City Guided Tours, LLC ("NYCGT"), OnBoard Las Vegas Tours, LLC ("OBLV"), Party Shuttle Tours, LLC ("PST"), and Washington DC Party Shuttle, LLC ("DCPS") (collectively, "non-NYPS petitioners") were one single employer with NYPS.[1] In response, petitioners filed a motion challenging, among other things: (1) the board's jurisdiction over the non-NYPS petitioners; and (2) the validity of the 2013 merits order given the holding in *NLRB v. Noel Canning*, 573 U.S. 513, 519 (2014). The Board rejected petitioners' challenge, dismissed petitioners' attempts to relitigate the underlying merits, and found that it lacked jurisdiction to modify the 2013 merits order. The compliance proceeding then went to a hearing before an ALJ.

At the hearing, the ALJ found that the backpay calculation was reasonable, petitioners constituted a single employer, and Pflantzer reasonably mitigated his damages. The Board affirmed the ALJ's rulings,

---

[1] NYPS and the non-NYPS petitioners are hereinafter referred to jointly as "petitioners." When necessary, the companies are referred to separately as NYPS or non-NYPS petitioners.

findings, and conclusions and adopted the recommended order. Petitioners again appealed, asserting this time, among other things, that: (1) they are not a single employer; (2) the Supreme Court's decision in *Noel Canning*, 573 U.S. at 519, voids the 2013 merits order; and (3) the backpay award is arbitrary, unreasonable, and without substantial evidence.

## II.

Congress afforded the NLRB broad discretion, with limited judicial review, when fashioning backpay awards. *See Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964). As such, the court should not disturb an order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* (quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)). So long as the Board "was not arbitrary in the selection of [its backpay] formula, its choice may not be rejected." *NLRB v. Charley Toppino & Sons, Inc.*, 358 F.2d 94, 97 (5th Cir. 1966).

Despite the discretion afforded to the Board, it does not receive a blank check. The court must ensure that the Board's factual findings are supported by "substantial evidence on the record considered as a whole." *NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923, 927 (5th Cir. 1993) (citing *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 311 (5th Cir. 1988)). When findings of fact concern credibility determinations, however, the court defers to the Board and should only disregard a determination if it is contradictory, "based on an inadequate reason, or no reason at all." *Id.* at 928 (quoting *NLRB v. Moore Bus. Forms, Inc.*, 574 F.2d 835, 843 (5th Cir. 1978)).

No. 20-61072

III.

Because the Board's single employer finding necessarily affects our *Noel Canning* analysis, we review that finding first.[2] We hold that substantial evidence supports the Board's single employer finding.

Several nominally separate business entities are considered "to be a single employer where they comprise an integrated enterprise." *Alcoa, Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (quoting *S. Prairie Constr. Co. v. Loc. No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 802 n.3 (1976) (per curiam)). "To determine whether several entities are a single employer within the meaning of the Act, the Board looks to four factors: (1) common ownership; (2) interrelation of operations; (3) common management; and (4) centralized control of labor relations." *Id.* (citing *Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam)). No one factor is controlling, and all factors do not need to be present, but the last three factors are considered the most important. *Id.*; *see also Oaktree Cap. Mgmt., L.P. v. NLRB*, 452 F. App'x 433, 438 (5th Cir. 2011) (per curiam) (citing *Covanta Energy Corp.*, 356 NLRB 706, 726 (2011)) (same). Ultimately, single employer status "depends on 'all the circumstances of the case' and is characterized as an absence of an 'arm's

---

[2] The Board adopted the ALJ's determination that NYPS, NYCGT, OBLV, PST, and DCPS constitute a single employer, which can be held jointly and severally liable for any unfair labor practices. It did not, however, adopt the ALJ's cumulative holdings that NYCGT is liable as an alter ego and as a *Golden State* successor to NYPS. Because the Board did not consider the alter ego or *Golden State* issues, neither will we. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87–88 (1943).

length relationship found among unintegrated companies.'" *Alcoa*, 849 F.3d at 255 (quoting *NLRB v. DMR Corp.*, 699 F.2d 788, 791 (5th Cir. 1983)).

A.

Substantial evidence supports the Board's finding that there is common ownership and financial control among petitioners. As the Board found and the record confirms, PST owns 100% of OBLV and NYCGT; 92.46% of NYPS; and nearly 99% of DCPS. Furthermore, Charles Thomas Schmidt—the CEO or former CEO of every involved company—owns 69.44% of Infinity Trade Capital, which respectively owns over 70% of PST. The Board also found that Schmidt exercises "almost unfettered control over the financial aspects of all five entities." Records demonstrate hundreds of banking transactions and expenditures through PST. Similarly, the Board found a significant amount of outstanding monetary loans from PST to DCPS, NYCGT, NYPS, and OBLV absent any formal loan agreements.

Government's exhibit 73 confirms the Board's finding of common financial control—although the Board itself did not rely on such evidence. In 2012, for instance, PST had a total of $866,581.79 in outstanding loans to petitioners. In 2013, those outstanding loans rose to $1,245,892.44. And, by 2016, PST's outstanding loans rose to a total of $3,189,661.95. The Board concluded that its findings evidenced a lack of an arm's length relationship between petitioners, which, in turn, evidenced common ownership and financial control. Thus, notwithstanding petitioners' claim that "no two petitioners have common ownership,"—which Schmidt's own testimony at the compliance proceeding directly contradicted—the Board's finding of

No. 20-61072

common ownership is supported by substantial evidence. *See Spurlino Materials, LLC v. NLRB*, 805 F.3d 1131, 1142 (D.C. Cir. 2015) (noting that common ownership need not be absolute, just substantial, and that no particular corporate structure is required).

## B.

The Board also found an interrelation of operations between all five petitioners, which substantial evidence supports. To determine whether there is an interrelation of operations, the Board considers, among other things, "whether the subject entities hold themselves out to the public and employees as a single business and whether the [entities] actually deal with one another at arm's length." *Alcoa*, 849 F.3d at 256 (citations omitted).

In support of its determination that there is an interrelation of operations between petitioners, the Board found that:

I.   Company buses from NYPS, DCPS, and even OBLV were transferred between companies during busy seasons;

II.  A PST employee established a call center in Houston to accept calls from NYPS, DCPS, and OBLV customers;

III. The same call center was used to monitor sales agents and provide training;

IV.  The OnBoard website included information and promotions for NYPS, DCPS, OBLV, and NYCGT;

V.   Less than arm's length loans were routinely transacted between petitioners;

VI.  Policies, procedures, employee conduct guides, training, and even uniforms overlapped between NYPS, DCPS, and OBLV; and

No. 20-61072

VII.   All petitioners shared the same bookkeeping company, which was wholly owned by Schmidt.

The record substantiates these findings.

Petitioners disagree with the Board's findings and argue that "multiple witnesses consistently testified that there was no interrelation of operations." Petitioners' arguments are unavailing. For one, petitioners themselves stipulated that they "engaged in consistent, significant transfers of funds of at least $50,000 per year." And, though not discussed in the Board's order, there is a litany of additional evidence that supports the Board's conclusion. As general counsel argued, and the record confirms: "Employees have onboardtours.com email addresses"; "Buses in New York and Washington use the OnBoard Tours logo, as do documents setting out employee policies and concierge commissions"; and "NYPS, [DCPS], and [NYCGT] all use Schmidt's Houston address as their business or mailing address." Contrary to petitioners' arguments, substantial evidence supports the Board's finding.

## C.

The Board similarly found that a common cast of characters, who operate on a "readily fungible" team, manage the companies. The Board made the following record-supported findings. Schmidt, the manager and designated CEO of PST, is also the CEO of OBLV, DCPS, NYCGT, and the former CEO of NYPS. Mengel, an investor in PST, worked in management positions for OBLV and DCPS. Lockhart worked for DCPS and holds a general power of attorney for NYCGT. Lockhart also served in a managerial

role at PST. June and White served as managing directors at NYPS, and both aided, or were formerly employed by, DCPS. White also aided in the development of training policies for all three cities. Abshire is the former vice president of sales and marketing at PST and held various training roles—along with Wilson—at NYPS, OBLV, and DCPS. And Moskowitz helped establish the OBLV office. He is also the former NYPS president, the sole manager and current president of NYCGT, and a frequent attendee of DCPS management meetings.

Petitioners disagree with the Board's findings and assert that "voluminous" witness testimony—from the likes of White, Moskowitz, Lockhart, Cook, and Schmidt—warrants a contrary finding. According to petitioners, the witnesses testified that they were each responsible for operations at their own companies; thus, there could not have been common management. Not so. As we have previously held, "day-to-day control of operations is not required to find that two entities are a single employer under the NLRA." *Alcoa*, 849 F.3d at 257 (citing *Oaktree Cap.*, 452 F. App'x at 442). Thus, even if it is true that there is *some* unique day-to-day management for each entity, petitioners cannot escape the otherwise overwhelming evidence that there is a common team overseeing operations. *See id.* at 258 ("[O]verwhelming control is not required.") (first citing *Spurlino Materials*, 357 NLRB at 1516 (holding that there were interrelated operations even though the involved entities were "created and licensed separately, [were] geographically removed and serv[ing] different markets in different states, and ha[d] their own personnel and equipment"); then citing *Royal Typewriter*

*Co.*, 209 NLRB 1006, 1010 (1974) (holding that there were interrelated operations even though "day-to-day matters were of necessity left to the separate divisions")).

## D.

While the aforementioned factors are relevant to determining whether petitioners constitute a single employer, "centralized control of labor relations is of particular importance." *Alcoa*, 849 F.3d at 258 (quoting *Oaktree Cap.*, 452 F. App'x at 438). "The fundamental inquiry is whether there exists overall control of critical matters at the policy level, not whether there is control over day-to-day labor decisions." *Id.* (citation and internal quotation marks omitted). Substantial evidence once again supports the Board's findings that there is centralized control over critical policy matters.

According to petitioners, "[e]ach company recruited, hired, trained, set salaries, disciplined, and fired its own employees with complete autonomy from the other companies." The record tells a different story. For example, the record evinces that Schmidt was involved in hiring, promoting, and reassigning managers at PST, DCPS, NYPS, OBLV, and NYCGT, including Cook, Lockhart, and White. To be sure, the Board noted that the local management teams generally hired tour guides and drivers. But the record reflects that Schmidt was still involved in disciplining and rehiring some of the same drivers and guides. Aside from Schmidt's involvement, the record reveals a centralized process for hiring, customer service, behavioral policies and procedures, and even uniform requirements. The Board also cited the Houston call center as evidence of centralized control of labor

No. 20-61072

relations, as the call center trained sales representatives to take calls for NYPS, OBLV, and DCPS. Taken together, these findings support the Board's conclusion that petitioners constitute a single employer.[3]

IV.

Petitioners next argue that the underlying 2013 merits order is void *ab initio* because of the Supreme Court's holding in *Noel Canning*. We disagree.

On January 4, 2012, then-President Obama appointed three individuals to the National Labor Relations Board, invoking the Recess Appointments Clause. *Noel Canning*, 573 U.S. at 520. After the appointment, a three-member panel of the newly configured Board found that Noel Canning, a Pepsi-Cola distributor, committed an unfair labor practice. *Id.* Noel Canning appealed, arguing that the three Board members were unconstitutionally appointed because the Senate was convening every

---

[3] Contrary to petitioners' argument on appeal, the Board had jurisdiction over the non-NYPS petitioners. The jurisdictional standard for retail businesses is $500,000 in annual gross business volume. *See Carolina Supplies & Cement Co.*, 122 NLRB 88, 89 (1958). For a nonretail enterprise, the standard is $50,000 across state lines annually. *See Siemons Mailing Serv.*, 122 NLRB 81, 85 (1958). Petitioners stipulated that they "engaged in consistent, significant transfers of funds of at least $50,000 per year," which necessarily crossed state lines. Moreover, petitioners' prospectus anticipated $10 million in collective revenue in 2017. Petitioners argue that the Board erred in relying on a "draft," yet they never argued that the draft was incorrect. Because petitioners constitute a single employer, the Board was correct to find that it had jurisdiction over the non-NYPS petitioners. *See 373-381 S. Broadway Assocs.*, 304 NLRB 1108, 1108 (1991) ("[I]t is well established that the commerce data of joint or single employers may appropriately be combined for jurisdictional purposes." (first citing *Jacob Wirth Rest.*, 248 NLRB 191 (1980), *enforced sub nom. NLRB v. Pizza Pizzaz, Inc.*, 646 F.2d 706 (1st Cir. 1981) (per curiam); then citing *Normandy Square Food Basket*, 163 NLRB 369 (1967); then citing *Pac. Hosts, Inc.*, 156 NLRB 1467 (1966)).

three days in *pro forma* sessions when they were appointed. *Id.* The D.C. Circuit agreed and held that the Board lacked the quorum necessary to act. *Id.*; *see also* 29 U.S.C. § 153(a) (providing for a 5–member Board); § 153(b) (providing for a 3–member quorum). The Solicitor General petitioned for certiorari, and the Court granted cert.

After interpreting the scope of the phrases "the recess of the Senate" and "vacancies that may happen during the recess of the Senate," and calculating the length of the Senate's recess, the Court held that the President appointed the three Board members during *pro forma* sessions, not periods of recess. *Id.* at 550. The Court consequently concluded that the President violated the Recess Appointments Clause and that the Board lacked a quorum, nullifying its prior order. *Id.* at 557; *see also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687–88 (2010) (holding that the Board cannot exercise its powers absent a lawfully appointed quorum).

Petitioners claim that *Noel Canning* necessarily invalidates the 2013 merits order because the same unconstitutionally appointed Board issued the order. The Board issued its 2013 merits order on May 2, 2013. The court granted default judgment against NYPS on November 19, 2013. *See New York Party Shuttle, LLC v. NLRB*, No. 13-60364 (5th Cir. Nov. 19, 2013) (per curiam). The Supreme Court handed down *Noel Canning* on June 26, 2014. Thus, as an initial matter, petitioners are correct that the Board acted without authority. The Board undoubtedly lacked a quorum with only two constitutionally appointed members. *See* 29 U.S.C. § 153(a), (b). As such,

No. 20-61072

the Board could not validly exercise its power, just as the Supreme Court held in *Noel Canning*.

Unlike the respondent in *Noel Canning*, however, petitioners did not immediately assert this constitutional defect. Rather, petitioners waited until the compliance phase of the bifurcated proceedings to challenge a procedural issue with the liability findings. Now, some seven years later, petitioners assert that this court acted without jurisdiction when entering default judgment, that they did not waive their Appointments Clause objection, and that they are not bound by res judicata. Thus, they (implicitly) argue that we should recall our 2013 mandate. We decline to do so. *See* 5TH CIR. R. 41.2 (stating that the court will only recall an issued mandate to "prevent injustice"); *see also Calderon v. Thompson*, 523 U.S. 538, 550 (1998) (stating that the power to recall a mandate is to be used only as a "last resort," and should be "held in reserve against grave, unforeseen contingencies").

Petitioners' arguments fly in the face of well-settled law. Take petitioners' jurisdictional argument first. While *Noel Canning* was pending before the Supreme Court, we were tasked with determining whether we needed to consider the constitutionality of a Board member's appointment for jurisdictional purposes. *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 (5th Cir. 2013). We held that we did not. *Id.* Pursuant to 29 U.S.C. § 160(e), the Board is imbued with the power to petition any court of appeals to enforce its order. Section 160(e) goes on to say that, "[u]pon the filing of such petition, the court . . . shall have jurisdiction of the proceeding." We read this provision to mean that our "jurisdiction is derived from the Board's filing of

13

a petition, not from the validity of the Board's underlying decision." *D.R. Horton*, 737 F.3d at 351. Thus, irrespective of the constitutional validity of the Board members' appointments, we held that we possessed appellate jurisdiction to review the underlying merits. *Id.*

The same jurisdictional principle applies here, though for slightly different reasons. Here, the Board did not file a petition to enforce an order under § 160(e). Rather, NYPS filed a petition for review of the Board's final order pursuant to § 160(f). Section 160(f), like § 160(e), provides that "the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction . . . ." Thus, our jurisdiction was predicated on NYPS' petition for review, not the validity of the Board's underlying decision or the constitutionality of the Board members' appointments. *See D.R. Horton*, 737 F.3d at 351.

Similarly, petitioners' argument that they could not have waived an Appointments Clause objection is without merit. In *Freytag v. C.I.R.*, the Supreme Court was asked "whether the authority that Congress has granted the Chief Judge of the United States Tax Court to appoint special trial judges transgresses our structure of separated powers." 501 U.S. 868, 870 (1991). Before holding that there was no separation of powers issue, the Court first addressed whether the petitioners waived their right to challenge the constitutional propriety of § 7443A—the relevant grant of appointment power—by, among other things, failing to timely object. *Id.* at 878.

To answer this question, the Court began by considering the structural and political roots of the Appointments Clause. The

Appointments Clause exists, the Court went on, to ensure that one branch does not encroach upon the power of another coordinate branch. *Id.* (citing *Mistretta v. United States*, 488 U.S. 361, 382 (1989)). The Court then considered the nature of an Appointments Clause challenge. Citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36 (1962), the Court held that Appointments Clause objections are nonjurisdictional structural constitutional objections. *Freytag*, 501 U.S. at 878–79; *see also D.R. Horton*, 737 F.3d at 351. Based on these conclusions, the Court determined that federal courts possess "discretion to consider nonjurisdictional claims that [were not] raised below." *Freytag*, 501 U.S. at 878 (collecting cases).

NYPS filed its petition for review on May 31, 2013. After it failed to file an opening brief, the court entered default judgment, affirming the Board's 2013 merits order on November 19, 2013. NYPS never raised an Appointments Clause challenge before the court. In fact, in its December 20, 2013 proposed brief—which NYPS filed with its subsequent motion for reconsideration—it made no mention of the Appointments Clause. There is no excuse for NYPS' failure to raise a constitutional defect argument at that time.

As of December 3, 2013, the Board's constitutionality was widely disputed with multiple pending lawsuits alleging an Appointments Clause violation. *See, e.g.*, *D.R. Horton*, 737 F.3d at 351 (Dec. 3, 2013); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 793–96 (8th Cir. Aug. 20, 2013); *NLRB v. Enter. Leasing Co. Se., LLC*, 722 F.3d 609, 632 n.14 (4th Cir. Jul. 17, 2013); *GGNSC Springfield LLC v. NLRB*, 721 F.3d 403, 406–07 (6th Cir. Jul.

2, 2013). What is more, the Supreme Court had already granted certiorari on the subject. *See Noel Canning v. NLRB,* 705 F.3d 490 (D.C. Cir. 2013), *cert. granted*, 570 U.S. 916 (U.S. Jun. 24, 2013). Notwithstanding multiple pending appeals, and a recent opinion from this court on the very subject, *see D.R. Horton*, 737 F.3d at 351, NYPS decided not to challenge the constitutionality of the recess appointments.

And, if *D.R. Horton* and *Freytag* were not enough, res judicata also counsels us against entertaining petitioners' *Noel Canning* challenge. "[U]nder the doctrine of res judicata, a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 326 (1955); *see also Nilsen v. City of Moss Point*, 701 F.2d 556, 559 (5th Cir. 1983) (en banc) (discussing the same preclusive effect). "[A] default judgment is a judgment 'on the merits' for purposes of res judicata." *Jones v. U.S. ex rel. Farmers Home Admin.*, No. 94-60391, 1995 WL 29363, at *1 (5th Cir. Jan. 20, 1995) (citing *Moyer v. Mathas*, 458 F.2d 431, 434 (5th Cir. 1972)). Four conditions must be established for res judicata to apply: (1) the parties in the present action must be the identical parties, or parties in privity with one another, from the prior action; (2) a competent court must have rendered a judgment in the prior action; (3) the prior action must have concluded with a final judgment on the merits; and (4) the same claim or cause of action must now be raised in the present action. *Id.*

The court already affirmed the Board's 2013 merits order; thus, petitioners are precluded from relitigating, even indirectly, the default

judgment and thereby the validity of the underlying order.  First, petitioners are the identical parties, or privies, from the 2013 default judgment.  The Board determined, and substantial evidence confirms, that petitioners are a single employer.  Given this single employer finding, NYPS—which Schmidt owned—necessarily proffered arguments that would benefit and defend the non-NYPS petitioners—which Schmidt indirectly owns.  The non-NYPS petitioners cannot now claim that they are "strangers to the cause." *Montana v. United States*, 440 U.S. 147, 154 (1979) (quoting *Souffront v. La Compagnie Des Sucreries De Porto Rico*, 217 U.S. 475, 487 (1910)).

Further, this court, which had appellate jurisdiction over the 2013 merits order, rendered judgment.  That judgment was final and on the merits.  Finally, the same claim is being asserted on appeal: namely, the claim that the 2013 merits order is unenforceable.  This time, rather than attacking the merits, petitioners allege that because the constitutional process for appointing the Board members was disregarded, the order must be void.  But that is just another issue that is directly subsumed within their main cause: nullifying the order.  Petitioners cannot now litigate this issue when it could have been raised on the initial appeal.  *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

V.

Finally, we consider the validity of the backpay award itself.  The Board ordered petitioners to pay Pflantzer $91,912 in backpay, plus interest compounded daily, accrued to the date of payment, and minus tax withholding required by law.  We affirm the Board's order, save the portion

No. 20-61072

of that order awarding backpay for the period of October 2014 to 2018.  As to that part of the order, we reverse and remand.[4]

A.

Pursuant to 29 U.S.C. § 160(c), the NLRB is authorized to award backpay as a remedy for unfair labor practices.  In awarding backpay, the Board should aim to "restor[e] . . . the situation, as nearly as possible, to that which would have [been] obtained but for the illegal discrimination." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941); *see also Charley Toppino*, 358 F.2d at 97 (stating that the Board is tasked with arriving at "the closest approximation to the likely earnings" of the employee as possible).  General counsel bears the burden of proving the gross amount of backpay due to each claimant.  *NLRB v. Pilot Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir. 1979).  The burden then shifts to the employer to put on affirmative defenses and to mitigate liability.  *Id.* (citing *NLRB v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 575 (5th Cir. 1966)).

---

[4] Petitioners offer multiple unsupported or inappropriate arguments on appeal. Petitioners claim, for instance, that NYPS lawfully discharged Pflantzer for operating a competing business.  Similarly, petitioners assert that because Pflantzer was a 1099 independent contractor, he is not entitled to excess taxes.  Those arguments go to the merits of the liability phase, which the Board and this court already resolved.  Petitioners may not turn their compliance proceeding appeal into another avenue to re-litigate the underlying 2013 merits order.  *See NLRB v. Laredo Packing Co.*, 730 F.2d 405, 407 (5th Cir. 1984) (per curiam).  Further, petitioners claim that because the compliance specification was amended multiple times, it was necessarily unreliable.  Petitioners fail to cite a single authority supporting such a claim; thus, their argument is abandoned.  *See Dardar v. Lafourche Realty Co., Inc.*, 985 F.2d 824, 831 (5th Cir. 1993) ("Questions posed for appellate review but inadequately briefed are considered abandoned." (citations omitted)).

No. 20-61072

The Board is entitled to broad discretion when settling on a backpay formula to reach its decision, such that the court should only reject the Board's finding if it deems the finding arbitrary. *Id.*; *see also Laredo Packing Co.*, 730 F.2d at 407 ("Indeed, when the Board orders restoration by way of back pay, the order will not be disturbed absent a showing that the order is an obvious attempt to further ends other than those which can be fairly said to effectuate the policies of the Act." (citation omitted)).

## B.

We turn first to petitioners' argument that the Board abused its discretion by selecting the comparator method as its backpay formula. General counsel—through a compliance officer—consulted the Board's Compliance Casehandling Manual ("Compliance Manual") and selected the comparable-employee formula, or comparator method, to calculate gross backpay. The officer chose this formula to account for the seasonal considerations and fluctuating hours that characterize the tour business. While the Board recognized that the comparator method produces an average, "not an exact science," it nonetheless accepted the method—one of the three basic methods the Compliance Manual endorses—as a reasonable means of approximating what petitioners owed Pflantzer. The Board's adoption of the comparator method was not arbitrary, and neither was its choice of comparator.

When choosing a comparator, the compliance officer "looked at other tour guides at NYPS with similar hours during the same period as Pflantzer and concluded that Edwin Jorge [] had similar hours to Pflantzer in 2014."

The Board accepted Jorge as a comparator given that he worked similar hours throughout most of the relevant period.  Dissatisfied with the Board's selection, petitioners claim that Jorge is not a proper comparator as he was a senior, "star" tour guide who always worked more hours than Pflantzer.  But petitioners did not "offer [their] own set of comparable employees nor did they calculate the earnings for such a set of comparators."  Thus, the Board only considered the reasonability of the approach the compliance officer proffered.  After weighing competing testimony, rejecting speculation, reviewing the officer's calculations, and considering the record before it, the Board agreed that Jorge was an adequate comparator.  The Board's selection of the comparator method, and its choice of comparator, was not arbitrary to the extent that the Board relied on Jorge for the hours that he *actually* worked.  *But see infra* Section V.D.

## C.

Petitioners' next argument concerns Pflantzer's mitigation of damages.  Once general counsel proves a backpay calculation, the burden shifts to the employer to mitigate damages, including proving that the employee failed to make a good-faith effort to mitigate losses.  *See Miami Coca-Cola Bottling Co.*, 360 F.2d at 575.  If an employer can prove that the employee incurred a willful loss of earnings, then the employee is not entitled to backpay.  *See Phelps Dodge Corp.*, 313 U.S. at 198.  Citing this burden-shifting framework, the Board found that petitioners "failed to satisfy [their] ultimate burden of showing that Pflantzer failed to mitigate damages."  Petitioners appeal that finding, but we find no merit in their argument.

No. 20-61072

As the Board's order and the record reflect, Pflantzer worked for multiple tour companies throughout the backpay period. He worked for Go NY Tours and his own company, New York See Tours, in 2014.[5] He was then briefly reinstated at NYPS. From 2015 to 2017, Pflantzer worked for USA Guided Tours, High Quality, Uncle Sam's, Open Loop/RSDL, Maxim, Wall Street Experience, One on One Tours, and his own company. The Board rejected petitioners' claim that Pflantzer's self-employment was inadequate, finding that general counsel properly adjusted the models to account for self-employment earnings. Based on these findings, the Board did not err in rejecting petitioners' mitigation argument.

## D.

Next, petitioners argue that the Board abused its discretion when it awarded Pflantzer backpay for the period of October 2014 through 2018. Because we agree with petitioners that the Board engaged in impermissible speculation when calculating backpay for this period, we reverse and remand on this issue.

The facts here are straightforward. Faced with no tour guide hour data after October 20, 2014, general counsel calculated Jorge's hours from October 2013 to September 2014 and then pasted those hours into the period

---

[5] Go NY Tours fired Pflantzer in January 2015 for union activity. Pflantzer waived reinstatement as part of his settlement. Petitioners take issue with Pflantzer's waiver, but, as the Board noted, Go NY Tours ceased operations shortly thereafter. So, even if Pflantzer had been reinstated, he would have been terminated again almost immediately after his reinstatement.

No. 20-61072

of October 2014 through 2018.  The Board then entered its backpay award predicated on this calculation.

While the Board is entitled to *some* discretion in calculating backpay, it is not permitted to arbitrarily calculate backpay.  *Charley Toppino*, 358 F.2d at 97.  But that is exactly what it did here.  Consider the compliance officer's testimony in this case.  The compliance officer was explicitly asked why it was important to have comparator data that spanned the entirety of the backpay period.  Citing the Board's Compliance Manual, she stated:

> I reviewed the compliance manual first, regarding the specific calculation method and it said specifically that it's important for the comparator employee to have data spanning the entire backpay period and the reason is that *you don't want to project*. If your comparator stops working for some reason, part way through the backpay period, *then you're guessing as to what that comparator would have earned for the rest of the backpay period*.

ROA.148 (emphasis added).  By extrapolating a one-year period across a four-year span, the Board openly disregarded its own Compliance Manual and engaged in impermissible speculation.  The arbitrariness of the Board's calculation is all the more apparent when the reasoning supporting the selection of the comparator method is considered: seasonality and fluctuating hours.  The Board intentionally selected a formula that was meant to account for an industry rife with inconsistent hours; yet, the same Board used that formula to project across a four-year period.

The Board's decision is also an "obvious attempt to further ends other than those which can be fairly said to effectuate the policies of the Act."

22

*Laredo Packing Co.*, 730 F.2d at 407 (citation omitted).   To defend its calculation, the Board, through the ALJ, reasoned:

> Second, while it seems unfair to Respondent NYPS that [the compliance officer] used Jorge's work hours for the last complete year (October 2013-2014) and applied those earnings through 2018 when NYPS was closing its operations by 2014, it is reminded that it was Respondent NYPS that violated the Act when it twice discharged Pflantzer and it is grossly more unfair that Pflantzer has not been remedied for the unlawful discharges.

ROA.4325.  Congress authorized the NRLB to award backpay to restore the discriminatee's situation to "that which would have [been] obtained but for the illegal discrimination." *Phelps Dodge*, 313 U.S. at 194.  Rather than aiming to make Pflantzer whole, however, the Board relied on the retributive effect of its "unfair" award as a defense.  Such a rationale does not effectuate the purposes of the Act.

## E.

Lastly, we turn to petitioners' evidentiary arguments.  Petitioners claim that the ALJ erred in his credibility determinations, his refusal to allow petitioners to recall the compliance officer to testify, and his backpay, tax, tip, and moonlighting calculations.  The ALJ weighed Pflantzer's testimony and explicitly addressed his faulty memory and the inaccuracies in his tax returns.  After weighing these discrepancies against his demeanor, the fact that he was under oath and could be prosecuted for perjury, and the fact that there was a

"significant lapse in time [due to] the Respondent's refusal to comply with Board orders," the ALJ found Pflantzer to be a credible witness.

Moreover, the Board did not rely solely on Pflantzer's tax returns in calculating the backpay award as petitioners argue. Rather, the Board considered findings from investigative interviews along with Pflantzer's testimony, 1099 forms, and tax returns. The Board made the same reasoned finding when it came to the inclusion of an average tip amount for the backpay calculation—a calculation based on testimony from Pflantzer that the ALJ found to be credible. And it made the same reasoned findings when calculating Pflantzer's moonlighting earnings. The Board weighed Pflantzer's testimony, reviewed the tax records it possessed, accounted for time he did not work, and then approximated his moonlighting earnings to account for fluctuations and, at times, a lack of self-reporting.

Further, the ALJ did not abuse his discretion when he did not permit petitioners to recall the compliance officer on these subjects. *See Miami Coca-Cola Bottling Co.*, 360 F.2d at 577. Petitioners were permitted to fully cross examine the officer on each issue, and they did exactly that.

\*    \*    \*

IT IS ORDERED that the Board's backpay award for the period of October 2014 to 2018 is REVERSED and the case is REMANDED for recalculation of the backpay damages in keeping with this opinion.

IT IS FURTHER ORDERED that the remainder of Board's backpay award is AFFIRMED.